420 Mass. 707                                                707

Blue Cross & Blue Shield of Massachusetts, Inc. *v.* Commissioner of Insurance.

BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS, INC.
*vs.* COMMISSIONER OF INSURANCE.

Suffolk. May 3, 1995. - June 28, 1995.

Present: LIACOS, C.J., LYNCH, O'CONNOR, & GREANEY, JJ.

*Medicare. Commissioner of Insurance. Practice, Civil*, Review of decision
of Commissioner of Insurance. *Insurance*, Commissioner of Insurance,
Rating. *Administrative Law*, Rate regulation, Judicial review, Substan-
tial evidence.

Statement of the standard of review of a decision of the Commissioner of
Insurance in reviewing proposed rates for insurance plans. [709-710]
A decision of the Commissioner of Insurance disapproving certain pro-
posed rates for two Medicare Supplement Insurance plans was not sup-
ported by substantial evidence where there was no basis in the record
for the conclusion that the insurer had not demonstrated that its re-
quested rates were reasonable; the matter was remanded to the com-
missioner for further consideration. [710, 713-715]
An order of the Commissioner of Insurance, authorizing a certain revised
1994 Medicare Supplement Insurance rate to remain in effect for 1995
to prevent disruption while the 1995 proposed rate rejected by the com-
missioner was under judicial review, was not an abuse of the commis-
sioner's discretion. [715]

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on December 30, 1994.

The case was reported by *Abrams*, J.

*Jeffrey Swope* (*Joseph J. Laferrera* with him) for the
plaintiff.

*Thomas O. Bean*, Assistant Attorney General, for the
Commissioner of Insurance.

LYNCH, J. The plaintiff, Blue Cross and Blue Shield of
Massachusetts, Inc. (BCBS), sought a review in the county
court of a decision of the Commissioner of Insurance (com-
missioner) disapproving its request for a 20% increase in the

rates for two of its Medicare Supplement Insurance plans, Medex Gold and Medex Standard. A single justice reserved and reported the matter without decision for determination of all issues by the full court. BCBS argues that the commissioner's decision is based on findings which are unsupported by substantial evidence. We vacate the commissioner's decision.

On October 3, 1994, pursuant to G. L. c. 176K, § 7 (1992 ed. & 1993 Supp.), BCBS submitted to the commissioner, for her review and approval, proposed Medex Gold and Medex Standard rates to be effective for billing dates occurring on or after January 1, 1995.[1] BCBS requested approval of a rate increase of 20.3% for Medex Gold and a rate increase of 19.2% for Medex Standard. On October 7, 1994, pursuant to G. L. c. 176K, § 7 (*g*), the commissioner issued a notice scheduling a public hearing on BCBS's rate filings for November 1, 1994. The Attorney General and the State Rating Bureau (SRB) intervened in the proceeding. On October 19, 1994, the Attorney General filed a motion to dismiss BCBS's filings, claiming that the filings failed to comply with the regulatory requirements set forth in 211 Code Mass. Regs. § 69.00 (1994). On November 18, 1994, the Attorney General and SRB submitted responsive filings explaining the basis for their position that the Medex rate increases proposed by BCBS should be denied.

On December 9, 1994, the presiding officer of the Division of Insurance, who was also the chief health insurance hearing officer, disapproved the 1995 proposed rate increases for the Medex Gold and Medex Standard programs. On the same day, the commissioner issued an order affirming the presiding officer's order. On December 15, 1994, BCBS sub-

---

[1] "Medex" is a trade name for a supplemental health insurance product marketed by BCBS to persons who are enrolled in Medicare. It is a form of "Medicare supplement" or "Medigap" insurance, so called because it fills many of the gaps in Medicare coverage and provides additional non-Medicare health insurance benefits. The proprietary names "Medex Gold" and "Medex Standard" designate two different levels of coverage available through BCBS.

mitted revised filings which complied with the December 9, 1994, orders.[2] Additionally, BCBS moved for reconsideration of the December 9, 1994, order and requested a reopening of the record to permit the introduction of evidence regarding the alleged effect of G. L. c. 176K. On December 23, 1994, the commissioner denied the motion for reconsideration. On January 25, 1995, the presiding officer issued a written memorandum, which was affirmed by the commissioner, explaining the previous order. BCBS sought a review of these orders in the Supreme Judicial Court for Suffolk County. On March 2, 1995, acting on the parties' joint motion, the single justice reported this case to the full court.

1. *Standard of review.* In this type of proceeding, the commissioner does not set rates but is empowered to review the proposed rates. G. L. c. 176K, § 7 (*d*) and (*g*). "No such rate shall be approved if the benefits provided therein are unreasonable in relation to the rate charged, nor if the rates are excessive, inadequate or unfairly discriminatory or do not otherwise comply with the requirements of this chapter." G. L. c. 176K, § 7 (*g*). See *Blue Cross of Mass., Inc.* v. *Commissioner of Ins.*, 397 Mass. 117, 119 (1986). The approval from the commissioner must be obtained prior to the implementation of the proposed rates. See G. L. c. 176K, § 7 (*d*) and (*g*). The commissioner may not require that rates be at figures she finds reasonable, and she must give deference to proposed rates so long as they fall within a range of reasonableness. *Blue Cross of Mass., Inc.* v. *Commissioner of Ins.*, *supra*, citing *Massachusetts Medical Serv.* v. *Commissioner of Ins.*, 344 Mass. 335, 339 (1962). Thus, it is not for the commissioner to set reasonable rates but rather to determine whether the proposed rates are reasonable. The burden is on the insurer to furnish evidence which enables the commissioner to establish a range of reasonableness. *Massa-*

---

[2]The submission of a revised filing by BCBS does not affect its right to appeal from those elements of the requested rate increase that were disapproved. 211 Code Mass. Regs. §§ 121.24 (3), 121.26 (1994).

*chusetts Ass'n of Older Ams.* v. *Commissioner of Ins.*, 393 Mass. 404, 407-408 (1984).

Our review of the commissioner's actions is governed by G. L. c. 176K, § 7 (*i*), which states that we are limited to a review of the record of proceedings before the commissioner, and we are to be guided by the provisions of G. L. c. 30A, § 14 (7) (1992 ed.). Thus, we shall not disturb the commissioner's decision unless it is based on an error of law, unsupported by substantial evidence, arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law. G. L. c. 30A, § 14 (7) (*c*), (*e*), and (*g*).

2. *Substantial evidence.* We begin our review, therefore, with an examination of the record to determine whether the commissioner's decision is supported by substantial evidence. Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Boston Edison Co.* v. *Selectmen of Concord*, 355 Mass. 79, 92 (1968), quoting G. L. c. 30A, § 1. An administrative finding must be set aside if "the evidence points to no felt or appreciable probability of the conclusion or points to an overwhelming probability of the contrary." *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 466 (1981), quoting L.L. Jaffe, Judicial Control of Administrative Action 598 (1965). We are not required to affirm a decision of the commissioner merely on a finding that the record contains evidence from which a rational mind might draw the desired inference. *Id.* Our determination must be made "upon consideration of the entire record." *Cohen* v. *Board of Registration in Pharmacy*, 350 Mass. 246, 253 (1966), quoting G. L. c. 30A, § 14. "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Cohen* v. *Board of Registration in Pharmacy*, *supra*, quoting *Universal Camera Corp.* v. *NLRB*, 340 U.S. 474, 488 (1951).

In disapproving BCBS's proposed rates, the commissioner concluded that "BCBS has failed to demonstrate that the implementation of [c.] 176K will not have the effect of improving the Medex risk pool and claims experience in 1995.

Rather, I am persuaded that in 1995, for the first time, a whole new category of Medex subscribers will have an opportunity to seek lower cost comparable coverage elsewhere, and that those lower premiums will present an attractive alternative for Gold and Standard subscribers." The commissioner further stated that she was "persuaded by the SRB's evidence that such an improvement may reasonably be expected and should be taken into account in BCBS' proposed rates." The commissioner concluded: "Because BCBS has failed to support the reasonableness of this aspect of its rates, by taking this effect into consideration in proposing its Gold and Standard rates, this element of its filing must be disapproved." BCBS contends that the commissioner's conclusion that the increased competition will likely cause positive selection for BCBS's Gold and Standard coverage is not supported by substantial evidence in the record.[3]

BCBS did not dispute that it would face increased competition from commercial carriers and health maintenance organizations (HMOs) in 1995. However, it argued that the changes in the risk pool insured by Medex Gold and Medex Standard due to such competition would not result in positive selection, but rather would result in adverse selection.[4] In support of this contention, BCBS argued that its principal commercial competitor, Bankers Life and Casualty Company (Bankers Life), had proposed increased compensation for its agents for enrolling younger and, therefore, on average healthier people; that HMOs were not attractive to people with existing illnesses who would want to maintain their existing physician relationships; and that Medex Gold and Medex Standard had a unique mail-service prescription drug

---

[3]"Positive selection" is defined in the commissioner's memorandum of decision as a term to characterize the phenomenon of individuals who are worse risks or have worse claims experience selecting other insurers over BCBS, thereby causing an improvement in the remaining BCBS risk pool.

[4]"Adverse selection" is defined in the commissioner's memorandum of decision as a term to characterize the phenomenon of individuals who are better risks or have better claims experience, selecting against an insurer or an insurance plan by dropping or by choosing not to purchase particular insurance coverage, thereby causing the remaining risk pool to worsen.

plan that was financially attractive to people on maintenance drugs, who were by definition people with chronic illnesses and, therefore, were worse than average risks. The commissioner stated that she found these contentions to be unpersuasive. However, the rejection of this evidence by the commissioner does not create substantial evidence to support a conclusion that positive selection will result from the enactment of G. L. c. 176K. See *Cohen* v. *Board of Registration in Pharmacy, supra* at 251-252 (rejection of evidence does not create substantial evidence to contrary).

Accordingly, we now must review the record to determine whether there is any evidence, beyond a mere rejection of BCBS's contentions, that G. L. c. 176K would have a positive selection effect on Medex rates. The SRB presented prefiled testimony from its actuary to support its contention that c. 176K would result in positive selection. The actuary stated that Medex subscribers would have several new options. They could switch to a Bankers Life product which was comparable to Gold Standard but had a 14.3% lower rate, or they had the option of switching to "HMO Blue for Seniors," which had comparable benefits but had a 35.3% lower rate.[5] The actuary also referred to other indemnity and HMO products with proposed rate increases of less than 10%. He assumed that virtually all of these products would offer comparable coverage at significantly lower rates. These less expensive options would appeal to the poorer Medex subscribers, who are statistically likely to be less healthy, and would result in an improved risk pool for BCBS.

Although the actuary made these statements in his prefiled testimony, during cross-examination, he essentially abandoned these contentions. On cross-examination, with respect to the option of choosing Bankers Life, the actuary was questioned concerning its proposed commission schedule. The proposed schedule included a differential in the commission

---

[5] "HMO Blue for Seniors" is a product offered by BCBS to people who are enrolled in Medicare. It is a prepared managed health care plan, under which the Health Care Financing Administration reimburses the HMO for services provided to members which are eligible for payment by Medicare.

an agent could receive based on the age of the enrollee. The actuary admitted that, if Bankers Life was successful in having this commission schedule put into place, one would expect that it would draw the "younger" Medicare beneficiaries to enroll in its program. He agreed that, in light of the facts that Bankers Life did not have a mail-service prescription drug program and that it proposed a commission schedule that would attract more people from a younger age group, it was not likely that Bankers Life would draw the worst risks from the Medex programs.

With respect to his conclusion that HMO products which proposed rate increases of less than 10% would offer comparable coverage at significantly lower rates, the actuary admitted that he could not know what rates the potential competitors had to begin with and, therefore, could not know what their rate levels would be after a less than 10% rate increase. Absent a clear reference point in the first year, there was no basis to conclude that the less than 10% filings will be above or below the proposed Medex rates.

With respect to the availability of HMOs, the actuary agreed that HMOs were already available as an alternative to the Medex programs and, therefore, any positive selection effects that might occur from the availability of HMOs would already be reflected in the historical experience of the Medex programs. He also conceded that older people, those who retired twenty to thirty years ago and now, because of their age, are the more expensive Medex subscribers, are not comfortable with HMOs. The actuary agreed that it is likely that the availability of HMOs, after January 1, 1995, would not result in positive selection for BCBS.

In light of the actuary's concessions on cross-examination, we conclude that the commissioner's decision, relying on the evidence and testimony submitted by SRB, that G. L. c. 176K would result in positive selection, is not supported by substantial evidence. The actuary's conclusion that it was not likely, but only possible, that Bankers Life would draw the worst risks from the Medex programs is not sufficient to create substantial evidence on which to base an administrative

finding. Additionally, the actuary admitted that, in this first year, he could not conclude that competitors who proposed rate increases of less than 10% would offer comparable coverage at significantly lower rates. Therefore, this testimony could not form the basis for the conclusion that competitors' rates would be significantly lower.

We recognize that, at times, it is necessary for the commissioner to exercise judgment, and we often defer to the commissioner's discretion and expertise. However, it is one thing for the commissioner to exercise some judgment, and another for her to speculate as to the existence of some future fact without any proper basis or explanation as to how the exercise of judgment leads to a conclusion that these competitors will offer significantly lower rates. See *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 389 Mass. 824, 845 (1983). A mere speculation concerning a matter of fact cannot form an adequate foundation for the commissioner's decision. See *Attorney Gen.* v. *Commissioner of Ins.*, 370 Mass. 791, 805 (1976). Finally, the fact that the actuary agreed that it is likely that the availability of HMOs after January 1, 1995, will not result in positive selection for BCBS clearly detracts from the weight of any evidence to the contrary.

The commissioner based her disapproval of BCBS's proposed rates on a finding that BCBS did not meet its burden of proving that its rates were not unreasonable because it failed to take into account the positive selection effect of G. L. c. 176K. Since the record lacks substantial evidence to support the finding that the statute will cause positive selection, the commissioner's disapproval of the rates cannot be sustained on that basis. However, we do not know what the commissioner's decision would be in the absence of any positive selection factor. We know that the commissioner found to be unpersuasive the assertion of BCBS that the legislative changes would result in adverse selection. She also noted that BCBS did not include an adverse selection adjustment in its filing. It is therefore necessary that the matter be remanded to the commissioner for her determination of the reasonable-

ness of the rates in the absence of any adverse or positive selection.

3. *Approval of revised proposed rates for 1995.* In the commissioner's order of affirmance, as an alternative to submitting a revised rate filing, she authorized BCBS to use the 1994 Medex Gold approved rates, which would remain in effect as a result of her disapproval of the proposed 1995 rates, for Medex Gold products to be issued on and after January 1, 1995. The commissioner authorized this alternative in an attempt to prevent a substantial disruption of the market caused by the lack of Medicare Supplemental Insurance products available on January 1, 1995. The commissioner further stated that, in the event that BCBS submitted a revised rate filing, it would be considered reasonable if it was based on the 1994 rates with an adjustment for the elimination of cross-subsidization. General Laws c. 176K, § 7 (*k*), grants the commissioner the power to issue orders which she finds proper, expedient, or necessary to enforce and to administer the provisions of the statute. The commissioner's actions in approving a request of BCBS to make available Medex coverage to new customers at the 1994 rates in order to prevent disruption in the market was not an abuse of her discretion. Since BCBS submitted revised filings in keeping with the commissioner's order, it cannot now object to the commissioner's approval of its proposed rates. *Associated Indus. of Mass., Inc.* v. *Commissioner of Ins.*, 403 Mass. 37, 39-41 (1988). But as we noted earlier, the filing of the revised rates does not impair BCBS's rights to appeal from the disapproval of the rates initially proposed. See note 2, *supra.*

4. *Disposition.* We remand the case to the single justice for entry of judgment vacating the decision of the commissioner and directing her to make findings and, if necessary, hold further hearings consistent with this opinion.

*So ordered.*