## BANKERS LIFE AND CASUALTY COMPANY *vs.* COMMISSIONER OF INSURANCE.

Suffolk. February 2, 1998. - March 23, 1998.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Medicare. Commissioner of Insurance. Insurance,* Commissioner of Insurance, Rating. *Practice, Civil,* Review of decision of Commissioner of Insurance. *Administrative Law,* Rate regulation, Judicial review, Substantial evidence. *Statute,* Construction.

This court concluded that, consistent with Federal law and industry standards, in a proceeding before the Commissioner of Insurance for the approval of proposed rate increases for Medicare supplement insurance plans, the commissioner may consider information other than compliance with the minimum loss ratio standards prescribed by G. L. c. 176K, § 7 (*d*) and (*e*), if the commissioner deems such information essential to the determination whether a proposed rate is reasonable. [139-143]

A decision of the Commissioner of Insurance disapproving an insurer's proposed rate increases for two Medicare supplement insurance plans was supported by substantial evidence, where the insurer failed to meet its burden of providing evidence regarding certain factors relating to expenses necessary to assess the "reasonableness" of the proposed rates. [143-145]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on July 18, 1996.

The case was reported by *Marshall, J.*

*Curtis J. Dickinson,* of Indiana (*Steven L. Goldblatt* with him) for the plaintiff.

*Edward J. DeAngelo,* Assistant Attorney General, for the defendant.

MARSHALL, J. On joint motion of the parties, a single justice of this court reserved and reported without decision the petition of Bankers Life and Casualty Company (Bankers Life) for judicial review of the decision of the Commissioner of Insurance (commissioner) disapproving its request for rate increases for two of its Medicare supplement insurance plans. Bankers Life argues that the commissioner exceeded her authority under G. L. c. 176K, § 7, which governs rate-setting procedures for

Medicare supplement insurance policies,[1] in using a methodology to determine the "reasonableness" of Bankers Life's proposed rates on grounds other than compliance with the statutory minimum loss ratio. Related to that argument is Bankers Life's claim that the disapproval of the proposed rates is, in any event, based on findings that are speculative and unsupported by substantial evidence. We conclude that, consistent with Federal law and the Minimum Standards Model Act of the National Association of Insurance Commissioners (NAIC),[2] the commissioner may consider information other than data necessary to validate the statutory minimum loss ratio if she deems it essential to her determination whether a proposed rate is "reasonable." We direct judgment to enter in the county court affirming the decision of the commissioner.

On November 14, 1995, Bankers Life submitted to the division of insurance (division) for review and approval pursuant to G. L. c. 176K, § 7, and 211 Code Mass. Regs. §§ 69.00 et seq. (1994), a proposed schedule of premiums for six different insurance plans providing Medicare supplement insurance. Bankers Life sought a rate increase of 21.5 per cent for its "core" Medicare supplement plan, and a rate increase of 30 per cent for its "Medicare Supplement 2" plan that provides core coverage and additional benefits including skilled nursing and prescription drugs. On January 5, 1996, the commissioner issued notice that, pursuant to G. L. c. 176K, § 7 (g), there would be a public hearing on the proposed rates on February 1, 1996. The Attorney General and the State Rating Bureau (SRB) intervened in the proceeding to oppose the submitted rate increases.

After conducting evidentiary hearings and accepting written testimony and other submissions, a hearing officer of the division issued a decision disapproving Bankers Life's proposed rates on June 28, 1996. On the same day, the commissioner approved the decision. On July 17, 1996, in response to the com-

[1]Medicare supplement, or "Medigap," insurance policies fill many of the gaps in, and provide additional non-Medicare health insurance benefits to persons who are eligible for, Medicare. *Blue Cross & Blue Shield of Mass., Inc.* v. *Commissioner of Ins.*, 420 Mass. 707, 708 n.1 (1995). See G. L. c. 176K, § 1. Approximately 18,400 Massachusetts residents are insured by Banker's Life under such policies.

[2]See National Association of Insurance Commissioners (NAIC), III Model Laws, Regulations and Guidelines (1996 & Supp. 1997) (NAIC model standards).

missioner's decision, Bankers Life submitted revised rate filings that proposed increases of 15.5 per cent for its core policy, and 13.1 per cent for its Medicare Supplement 2 policy. These rates were approved. On July 18, 1996, pursuant to G. L. c. 176K, § 7 (*i*), Bankers Life filed its petition in the county court for judicial review of the June 28 decision.

1. *The commissioner's methodology for approving proposed rate increases.* Bankers Life's claims rest all but entirely on its assertion that, in determining whether a proposed rate is reasonable, the commissioner may consider only whether the rate meets the minimum loss ratio standards[3] imposed by G. L. c. 176K, § 7 (*d*), (*e*).[4] According to Bankers Life, the statutory minimum loss ratio represents "the supreme, definitive and exclusive measure" of whether a rate is reasonable, and the commissioner exceeded her authority in applying a test for reasonableness that included non-loss ratio factors such as administrative expenses or accounting for investment income. The commissioner responds that the statutory minimum loss ratio is a threshold requirement for rate approval that is independent of, and does not replace, the "reasonableness" test mandated by G. L. c. 176K, § 7 (*d*) and (*g*), that the test for reasonableness requires consideration of other factors, including an insurer's other expenses and income, and that the minimum loss ratio is only one of several criteria that an insurer must meet.

Our review of the commissioner's actions is governed by G. L. c. 176K, § 7 (*i*), which provides that we are "limited to the record of proceedings before the commissioner," and that we shall "uphold the commissioner's action, order, finding, or decision if it is consistent with the standards set forth in [G. L. c. 30A, § 14 (7)]." We shall not disturb the commissioner's decision "unless it is based on an error of law, unsupported by substantial evidence, arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law." *Blue Cross & Blue Shield of Mass., Inc.* v. *Commissioner of Ins.*, 420 Mass. 707, 710 (1995). See G. L. c. 30A, § 14 (7) (*c*), (*e*), and (*g*). In addition, as the challenging party, the burden is on Bankers Life to demonstrate that the decision of the commissioner was incor-

---

[3]A loss ratio is "the ratio of benefits provided to premiums collected." 42 U.S.C. § 1395ss(b)(1)(C)(ii) (1994).

[4]Because Bankers Life is a commercial insurer, G. L. c. 176K, § 7 (*e*) (iii), mandates that it meet anticipated loss ratios of at least sixty-five per cent.

rect. G. L. c. 30A, § 14 (7) (*d*). See *Aristocratic Restaurant of Mass., Inc.* v. *Alcoholic Beverages Control Comm'n (No. 1)*, 374 Mass. 547, 551, appeal dismissed, 439 U.S. 803 (1978).

General Laws c. 176K, enacted in January of 1994, governs all policies for Medicare supplement insurance. St. 1993, c. 495, § 45. Of particular relevance to our inquiry is § 7, which governs premium increases, annual reporting requirements, approval by the commissioner of proposed rates, and judicial review. Subsection 7 (*d*) provides that the commissioner may disapprove proposed rates for Medicare supplement insurance policies "if the benefits provided therein are unreasonable in relation to the rate charged, or if they are excessive, inadequate or unfairly discriminatory or do not otherwise comply with the requirements of this chapter." If the commissioner does not disapprove the proposed rates, the rates are generally deemed approved, provided that the rates comply with the anticipated "minimum loss ratio standard" imposed by subsection 7 (*e*).

General Laws c. 176K, § 7 (*g*), sets out additional requirements in cases, such as here, where the insurer submits rate increases that exceed ten per cent of the premium previously charged. Those proposed rates are "subject to the prior approval of the commissioner as set forth in this subsection," and the subsection requires that the commissioner determine whether "the benefits provided therein are unreasonable in relation to the rate charged" or whether the proposed rates are "excessive, inadequate or unfairly discriminatory or do not otherwise comply with the requirements of this chapter." G. L. c. 176K, § 7 (*g*). The subsection also requires the commissioner to conduct a public hearing and to determine, on the basis of information submitted by the insurer, that the carrier utilizes techniques "which have had or are expected to have a demonstrated impact on the prevention of reimbursement by the carrier for services which are not medically necessary." *Id.*

Bankers Life claims that G. L. c. 176K was enacted to conform State Medicare insurance policy regulations to definitive standards required under Federal law, and that, once an insurer demonstrates that it has met the statutory minimum loss ratio, in this case sixty-five per cent, no further inquiry as to the reasonableness of the proposed rates is permitted by the commissioner. The enabling statute, it says, may not be construed to require a commercial insurer to set rates any lower than are reasonably necessary to meet the statutory sixty-five per cent loss ratio. We do not agree.

In *Blue Cross & Blue Shield of Mass., Inc.* v. *Commissioner of Ins., supra,* we had occasion to comment on G. L. c. 176K, § 7 (*d*) and (*g*). We said that the commissioner must give deference to proposed rates "so long as they fall within a range of reasonableness." *Id.* at 709. See *Blue Cross of Mass., Inc.* v. *Commissioner of Ins.,* 397 Mass. 117, 119 (1986). The plaintiff in *Blue Cross & Blue Shield,* unlike Bankers Life, did not dispute the methodology used by the commissioner to determine whether its proposed rate increase was unreasonable. Nevertheless, our conclusion in that case that a proposed rate must fall within a "range of reasonableness" is entirely inconsistent with the assertion that compliance with the minimum loss ratio is the sole determining factor on which the commissioner must rely. A "range of reasonableness" standard is not incompatible with the present statutory provisions, and there is no basis on which to conclude that in 1994 the Legislature intended to replace that standard with the enactment of a fixed, minimum loss ratio standard.[5]

The argument advanced by Bankers Life also violates a basic tenet of statutory construction that a statute must be construed "so that effect is given to all its provisions, so that no part will be inoperative or superfluous." 2A B. Singer, Sutherland Statutory Construction § 46.06 (5th ed. 1992). See *Pentucket Manor Chronic Hosp., Inc.* v. *Rate Setting Comm'n,* 394 Mass. 233, 242 (1985); *International Org. of Masters, Mates & Pilots, Atl. & Gulf Maritime Region* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.,* 392 Mass. 811, 813 (1984). The claim that the minimum loss ratio mandated by G. L. c. 176K, § 7 (*d*) (i) and (*e*), preempts all other statutory requirements, reduces to a nullity at the very least the commissioner's obligation to determine that the proposed benefits are not "unreasonable in relation to the rates charged" or "excessive" under G. L. c. 176K, § 7 (*d*) and (*g*), and the obligation imposed on the commissioner by G. L. c. 176K, § 7 (*g*), to conduct a public

[5]The standard of review under G. L. c. 176K, § 7 (*d*) and (*g*), is the same as the standard of review contained in G. L. c. 176A, § 6, and G. L. c. 176B, § 4, the statutes that applied to the Medicare supplement rate filings by a hospital or medical service corporation before the enactment of G. L. c. 176K. The principles governing rate reviews under G. L. c. 176A and G. L. c. 176B are, therefore, pertinent. See *Blue Cross of Mass., Inc.* v. *Commissioner of Ins.,* 397 Mass. 117, 124 (1986); *Massachusetts Ass'n of Older Ams., Inc.* v. *Commissioner of Ins.,* 393 Mass. 404, 407 (1984).

hearing, if a carrier proposes an increase in premium of ten per cent or more than the premium previously charged.

The commissioner's methodology is also compatible with Federal law. General Laws c. 176K, § 7 (*f*), directs the commissioner to promulgate rate approval regulations that "shall be consistent with the requirements of OBRA 90 [the Omnibus Budget Reconciliation Act of 1990]."[6] Bankers Life argues that neither OBRA 90, nor the NAIC model standards incorporated in the Federal statute,[7] refer to "reasonableness of rates" in any manner other than with reference to the minimum loss ratio rule. It argues that the OBRA 90 "regime" terminates the commissioner's discretion to determine "that a particular method of calculating an element of proposed rates would lead to excessive rates." *Blue Cross of Mass., Inc.* v. *Commissioner of Ins.*, 397 Mass. 117, 124 (1986). While the Federal statute does set certain minimum criteria for Medicare supplement insurance policies, there is nothing to suggest that, in enacting OBRA 90, Congress intended to supplant entirely the traditional role of States in regulating insurance. The Federal statute expressly recognizes that a State may establish its own regulatory program and may provide "for a process for approving or disapproving proposed premium increases with respect to such policies." 42 U.S.C. § 1395ss(b)(1)(G).

Moreover, Massachusetts is authorized under Federal law to administer a regulatory program that is more stringent than Federal law. Title 42 U.S.C. § 1395ss(b)(1)(A) provides that a State may receive approval from the United States Secretary of Health and Human Services (HHS) to establish its own rate review process, so long as the process "provides for the application and enforcement of standards with respect to such policies equal to *or more stringent* than the NAIC Model Standards" (emphasis added). Massachusetts received such approval from HHS on July 30, 1992. Two years later, on September 28, 1994, HHS approved the regulations governing the Massachusetts "Medigap" insurance rate review process

---

[6] "OBRA 90" is defined in G. L. c. 176K, § 1, as the Federal Omnibus Budget Reconciliation Act of 1990 (Pub. L. 101-508), as amended, codified in the Social Security Act, 42 U.S.C. §§ 1395 et seq. (1994).

[7] Title 42 U.S.C. § 1395ss(k)(3) provides that no Medicare supplement insurance policy may be certified unless it meets the minimum standards provided in the NAIC model standards or Federal model standards, if any are promulgated. See 42 U.S.C. § 1395ss(k)(2)(A).

submitted to it by the division. 211 Code Mass. Regs. §§ 69.00 et seq. (1994).[8] Recognizing that Massachusetts may impose standards more stringent than Federal law provides, Bankers Life argues that Massachusetts is free to do so only by imposing loss ratios more onerous than the minimum loss ratio standards required by Federal law, for example, seventy-five per cent or eighty per cent in the case of a commercial carrier. Federal law, however, provides that Medicare supplement insurance policies are subject to numerous requirements, including, but not limited to, the applicable minimum loss ratio. See 42 U.S.C. § 1395ss(b), (c).

The commissioner's methodology is also consistent with the NAIC model standards. We agree with Bankers Life that the NAIC model standards establish a methodology for calculating loss ratios that requires a "pure" loss ratio calculation based on "incurred claims" and "earned premiums," and that prohibits the inclusion of extraneous factors in the calculation of the "incurred claims" numerator of the ratio. But the NAIC model standards do not provide that the minimum loss ratio standard is the only means of making that determination.[9] Section 13 of the NAIC model standards governs loss ratios. A drafting note following § 13 states that the section "does not in any way restrict

---

[8]Bankers Life suggests that the Massachusetts regulations were approved by Federal authorities based solely on a "facial reading" of the regulations. Those regulations, it says, may be construed to require submission by an insurer only of retention data necessary to validate the minimum loss ratio claimed by the insurer. The Federal authorities, it argues, "apparently" found the Massachusetts regulations susceptible to this construction. Bankers Life provides no support for its assertion. A better interpretation of the regulations is offered by the commissioner. For example, the Massachusetts regulations provide that rates may be disapproved if the benefits are "unreasonable" in relation to the rate charged, or if the rates are "excessive, inadequate, or unfairly discriminatory." 211 Code Mass. Regs. § 69.12(15) (1994).

[9]The NAIC model standards provide in relevant part:

> "Medicare supplement policies shall return to policyholders benefits which are reasonable in relation to the premium charged. The commissioner shall issue reasonable regulations to establish minimum standards for loss ratios of Medicare supplement policies on the basis of incurred claims experience, or incurred health care expenses where coverage is provided by a health maintenance organization on a service rather than reimbursement basis, and earned premiums in accordance with accepted actuarial principles and practices."

III NAIC Model standards at 650-4.

a commissioner's statutory authority, elsewhere granted, to approve or disapprove rates." A State remains free to require a carrier seeking rate approval to submit additional information to its regulating authority to insure that proposed rates are reasonable.

2. *Substantial evidence for the commissioner's decision.* In rate review proceedings under G. L. c. 176K, § 7, the burden is on the insurer to furnish evidence that enables the commissioner "to establish a range of reasonableness." *Blue Cross & Blue Shield of Mass., Inc.* v. *Commissioner of Ins.*, 420 Mass. 707, 709 (1995). Where, as here, the commissioner has determined that an insurer has failed to meet its burden, we review the decision to determine "whether the commissioner has arbitrarily or capriciously overlooked elements of a proposed filing, or arbitrarily or capriciously incorporated unsupported factual assumptions in [her] decision, or whether [s]he has abused [her] discretion by setting a standard for burden of proof which is not in accordance with law." *Blue Cross of Mass., Inc.* v. *Commissioner of Ins.*, 397 Mass. 117, 123-124 n.8 (1986). Our judicial deference to the commissioner's "experience, expertise, and discretion" applies particularly to her "choice of methodology" in rate cases. *Aetna Cas. & Sur. Co.* v. *Commissioner of Ins.*, 408 Mass. 363, 378-379 (1990). We review her decision in that light.

The hearing officer determined that Bankers Life had ignored several factors necessary to assess the reasonableness of its proposed rates. Regarding administrative expenses, for example, she explained that relying on the minimum loss ratio criteria alone presents an imperfect picture of the reasonableness of rates: "[I]f claims costs have increased, but expenses have decreased, rates requested based solely on a loss ratio analysis may not accurately portray the factors influencing the need for a rate change."[10] An actuarial expert for the SRB testified that "loss ratios are not a reasonable proxy for analysis of expenses"

---

[10]An example suggested by the commissioner is illustrative: An insurer requests a premium rate of $100 and anticipates losses of $65. In that case the insurer has met the minimum loss ratio of sixty-five per cent, and retains $35 for profit and administrative and other expenses. The following year a popular, expensive new procedure is available that doubles its expected losses to $130. A $200 premium proposed by an insurer would meet the minimum loss ratio of sixty-five per cent, and the retention would be $70. If administrative and other expenses have remained the same, likely because the increase in losses is unrelated to such expenses, the increased premium would bear no relation to

and that reliance solely on the minimum loss ratio could discourage insurers from instituting cost containment programs.[11] Bankers Life never purported to demonstrate that its administrative expenses supported the reasonableness of its rates, deeming this a wholly irrelevant consideration. The hearing officer could rightly conclude that she could not determine whether the requested rates were excessive without first determining the expenses that should reasonably be reflected in the rates.

The commissioner also considered the effect of investment income on the reasonableness of the rates proposed by Bankers Life. Bankers Life did not provide the division with any analysis of its investment income or the effect of that income on the reasonableness of its rates.[12] It is appropriate to consider investment income as a source of revenue that offsets costs such as claim costs. See *Workers' Compensation Rating & Inspection Bur. of Mass.* v. *Commissioner of Ins.*, 391 Mass. 238, 254 (1984). See also *Massachusetts Auto. Rating & Acc. Prevention Bur.* v. *Commissioner of Ins.*, 381 Mass. 592, 604-605 (1980) ("The financial facts of life — not unrecognized in the industry — are that money is made on investments, not on underwriting"). An SRB expert testified to that effect.

Finally, Bankers Life asserts that it demonstrated that it had suffered "rate deficiencies" for each of its plans based on the rates of the previous year. According to Bankers Life, a rate deficiency occurs whenever its actual loss ratio exceeds its

the costs of the insurer, and the insurer would likely receive a substantial and unwarranted increase in its profits. Bankers Life argues that, in these circumstances, the commissioner is nevertheless precluded from any further inquiry concerning the reasonableness of the $200 premium.

[11]Cost containment is a statutory objective. G. L. c. 176K, § 7 (*g*) (in reviewing rates "the commissioner shall make a finding . . . that the carrier employs a utilization review program and other techniques . . . which have had or are expected to have a demonstrated impact on the prevention of reimbursement by the carrier for services which are not medically necessary"). We reject Bankers Life's claim that the utilization review program has no bearing on a determination of the reasonableness of a proposed rate, and merely requires the commissioner to ascertain whether an insurer has in place a sensible and effective program. We also reject Bankers Life's argument that, because there was insufficient evidence of cost containment, the hearing officer "speculated" about the amount of cost containment savings.

[12]An expert for Bankers Life did testify that investment income credit is not part of the loss ratio calculation. We agree. But that testimony does not contradict the commissioner's claim that she may appropriately consider investment income as a source of revenue that may affect the reasonableness of a rate.

expected loss ratio. The hearing officer considered and credited an expert's conclusion challenging the method used by Bankers Life to calculate a deficiency, and credited the expert's testimony that a rate deficiency occurred "if claims plus expenses exceed premium." Because Bankers Life provided no data regarding its actual expenses, the commissioner correctly determined that Bankers Life had presented insufficient evidence "to demonstrate the reasonableness of a rate deficiency adjustment to its proposed rates."

Judgment shall enter in the county court affirming the decision of the Commissioner of Insurance.

*So ordered.*