Murphy, Ernest B., J.
The Plaintiff, Susan Melican (“Melican”), brings this action seeking judicial review under G.L.c. 30A, §14 (2004 ed.), challenging the decision of the Defendant, Gerald J. Morrissey, Jr. (the “Commissioner”), Commissioner of the Department of Mental Retardation (“the Department”), to deny the Plaintiffs eligibility appeal. Specifically, pursuant to 115 Code of Massachusetts Regulations 6.04(l)(b) and 6.33(2)(i), the Department modified the Hearing Officer’s determination that Melican is “a person with Mental Retardation as defined in 115 CMR2.01.” For the reasons set forth below, the Plaintiffs motion for judgment on the pleadings is ALLOWED. The decision of the Department is REVERSED.

*724
BACKGROUND I. Facts

Melican, who was 56 years old at the time of the March 8, 2004 eligibility appeal hearing, contracted encephalitis at age eighteen months. This resulted in epilepsy and cognitive deficits. She had a modified education program including special education classes. Although there were no reliable IQ test scores presented prior to age eighteen, the Hearing Officer found that the weight of the evidence led to the conclusion that Melican manifested her sub-average intellectual functioning before age eighteen.
Melican was administered two IQ tests in 1997 and one in 2004. The first test was a Wechsler Adult Intelligence Scale (“WAIS-R”) test, initially released in 1981. The test was administered on October 31, 1997 by Dr. Melvin Lew (“Lew”). Lew indicated that Melican’s IQ scores on the administration of the test were: (1) a Verbal IQ score of 81; (2) a Performance IQ score of 85; and (3) a Full Scale IQ score of 80. However, the Hearing Officer did not give the report as much weight as she gave the subsequently administered IQ tests because no accompanying interpretive report was attached to the results.
In December of 1997, a second WAIS-R test was administered, this one by Dr. Alex Ursprung (“Ursprung”). Melican’s IQ scores on the second administration of the test were: (1) a Verbal IQ score of 84; (2) a Performance IQ score of 82; and (3) a Full Scale IQ score of 83. Ursprung’s report stated that Melican was in the low average intellectual functioning range according to the Wechsler classification and the borderline range of intellectual functioning according to the Diagnostic and Statistical Manual of Mental Disorder (DSM-IV) classification. Ursprung’s report also stated that Melican had significant cognitive brain damage, extraordinary deficits in social judgment and adaptive behavior, the characteristics of an individual with severe organic damage, and “the hallmarks of what used to be called an organic personality disorder.” The Hearing Officer noted that although Ursprung believed the Plaintiff did not technically test-out as mentally retarded, she functions like a mentally retarded person.
In February of 2004, a third IQ test was administered, this one by Dr. Robert Holloway (“Holloway”). The test was a WAIS-III, a renormed version of the WAIS-R. Melican’s IQ scores on the third administration of the IQ test were: (1) a Verbal IQ score of 78; (2) a Performance IQ score of 75; and (3) a Full Scale IQ score of 75. Holloway stated that these scores place Melican in the borderline range of intellectual functioning and that borderline intellectual functioning is generally associated with IQ values that fall within the 71-84 range. IQ values between 50 and 70 constitute the mild mentally retarded range of functioning. Holloway also noted that Melican’s deficiency on the Comprehension sub-test fell at the first percentile. Melican’s ability to use practical knowledge and judgment in social situations within a verbal format was markedly deficient. Holloway’s report stated that Melican is not capable of independent living and will require a supportive living system for the rest of her life. However, Holloway concluded that the result of this evaluation failed to support a diagnosis of mild mental retardation.
Dr. Richard Costigan (“Costigan”), the Department’s expert, testified at the March 8, 2004 hearing. Costigan testified that he initially determined that Melican did not meet the criteria for Adult Services from the Department based on the first 1997 IQ administration and that he maintained this view after reviewing the results of the second and third IQ tests. He testified that none of the three evaluations show the Plaintiffs IQ scores as two or more standard deviations below the mean. He testified that Melican would be eligible for Department services if all three IQ scores were 70 or below. However, Costigan testified that Melican has significant limitation in three adaptive skill areas: (1) community use, (2) health, and (3) safety and work.
Costigan was asked whether “an IQ score of 75 as was first determined by Dr. Holladay [sic], could mean an IQ — an actual IQ of 70,” in reference to the 75 that Melican had scored on her most recent IQ test (the WAIS-III test). Costigan responded that “70 is the same standard error of measurement.” Costigan had previously testified that the standard error of measurement would swing 5 points in either direction: “[T]he standard error of measurement would be — for a score of 80, it would be 75 to 85. With a score of 83, it would be 88 to 78.” In addition, during the hearing Margaret Melican, the Plaintiffs sister, asked Costigan which of the IQ tests that were administered to Melican had produced the most accurate result:
Q: Now, when Susan took the two — from two test administrators, the WAIS-R, her IQ results was [sic] 80 or more.
A: Mm hmm.
Q: And yet, when she took the Wechsler Adult Intelligence Scale 3 test, after the Wechsler Adult Intelligence Scale 3 was introduced, she had a score of 75?
A: Correct.
Q: Which is the more- — taking into consideration the (inaudible) which is the more correct result of the test?
A: Um,
Q: If you know?
A: It would be (inaudible) Wechsler. It would be more.
Margaret Melican also questioned Costigan on the application of the “full effect premise” on the first two IQ tests administered to the Plaintiff:
*725 A: The full effect is — it is an observation that is put out there for the IQ test. That the norms that that test was made under have changed. And therefore, the scoring of that test must take into consideration outdated norms.
Q: In other words, the full effect premise is that people are scoring higher and higher on IQ tests from the time that the test was actually developed until a new test can be introduced?
A: Tim, about three years after a test is put out.
Q: All right. After the test is put out, the IQ test results of the scores tend to rise?
A: That’s correct.
Q: So that by the years 1997, a score of 80 would be higher than if the test-taker took the WAIS-R the next year?
A: I’m sony? Ask that one again?
Q: If you score an IQ of (inaudible) or an IQ score of 80,
A: Mm hmm.
Q: — in the last year that the WAIS-R test was available?
A: Mm hmm.
Q: And then, you took the Wechsler Adult Intelligence Scale 3, which is the first year that the Wechsler Adult Intelligence Scale 3 was available—
A: Mm hmm.
Q. — would you not score lower than 80?
A: On average, yes. People would score lower. I wouldn’t say every case, but on average, yes.
In addition, Costigan testified that the Plaintiff functions at a below-average, borderline range, and, “based on IQ scores, [the Plaintiff] has a number of challenges.” He stated that she falls within the sixth to seventh percentile of cognitive functioning. Finally, Costigan testified that the Plaintiff shows “significant limitations” in three of the seven areas that are considered in determining an individual’s Adaptive Functioning Deficits for purposes of satisfying the Department’s eligibility criteria for services under 115 CMR 6.04. Costigan testified that “if we were to look at [Melican’s] adaptive function presently, she does have three areas that would meet significant limitations ... in communify use, health and safety and work.”
In her March 25, 2004 decision, the Hearing Officer found that Melican had shown by a preponderance of the evidence that she meets the Department’s eligibility criteria. The Hearing Officer noted that the Commonwealth had conceded Melican’s satisfaction of the criteria set forth in 115 CMR 6.03(a) and (c), she is domiciled in the Commonwealth and is in need of specialized supports in three or more of the seven adaptive areas required for eligibility (community use, health and safety, and work). The only dispute was whether the Plaintiffs IQ scores supported a finding that she is a person with mental retardation as defined by Department regulations. The Hearing Officer found that Melican met the definition of mental retardation under G.L.c. 123B, §2 and 115 CMR 2.01, consistent with the currently (1994) accepted clinical authority of the American Association on Mental Retardation (“AAMR”).
On June 17, 2004 the Commissioner notified Melican that pursuant to 115 CMR 6.33(i), he was denying the Plaintiffs eligibility appeal. The Commissioner modified the Hearing Officer’s decision because the “conclusion of law and decision . . . [were] based upon an abuse of discretion, or otherwise not in accordance with the law." Specifically, the Commissioner stated that the Hearing Officer’s decision was premised upon an erroneous conclusion that went against the logic and facts presented at the hearing and failed to make her decision based upon consideration of the entire record.

II. Statutory and Regulatory Authority Governing Eligibility for Department Supports A. Department Eligibility Requirements

General eligibility for Department services is addressed in 115 CMR 6.04, which provides that:
Persons who are 18 years of age or older are eligible for supports provided, purchased, or arranged by the Department if the person: (a) is domiciled in the Commonwealth, (b) is a person with mental retardation as defined in 115 CMR 2.01, and (c) is in need of specialized supports in three or more of the following seven adaptive skill areas: communication, self-care, home living, community use, health and safety, functional academics, and work.

Id.

B. The Department’s Definition of Mental Retardation

General Laws c. 123B governs issues relating to mental retardation in the Commonwealth. G.L.c. 123B (2005 ed.). The statute defines a “mentally retarded person” as: a person who, as a result of inadequately developed or impaired intelligence, as determined by clinical authorities as described in regulations of the department, is substantially limited in [her] ability to learn or adapt, as judged by established standards available for the evaluation of a person’s ability to function in the community. Id.
Under this authority, the Department has promulgated regulations, including a set of specific and detailed definitions that are codified in 115 CMR 2.01. These regulations define “mental retardation" as follows:
Mental retardation means, consistent with the currently (1994) accepted clinical authority of the American Association on Mental Retardation (“AAMR”], substantial limitations in present functioning. Mental retardation begins before age 18, *726 and is manifested by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable skill areas: communication, self-care, home living, social skills, communiiy use, self direction, health and safety, functional academics, leisure and work.

Id.

C. The American Association on Mental Retardation’s Definition of Mental Retardation
The AAMR defines mental retardation as “a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before the age of 18.”[2] In addition, the AAMR lists five assumptions that are “essential to the application of the definition.” Specifically, the AAMR definition assumes that: (1) limitations in present functioning must be considered within the context of community environments typical of the individual’s age, peers, and culture; (2) a valid assessment considers cultural and linguistic diversity as well as differences in communication, sensory, motor, and behavioral factors; (3) within an individual, limitations often coexist with strengths; (4) an important purpose of describing limitations is to develop a profile of needed supports; and (5) with appropriate personalized supports over a sustained period, the life functioning of the person with mental retardation generally will improve. Id.
The AAMR’s Frequently Asked Questions (“FAQ”) section on mental retardation explains that:
A complete and accurate understanding of mental retardation involves realizing that mental retardation refers to a particular state of functioning that begins in childhood, has many dimensions, and is affected positively by individualized supports. As a model of functioning, it includes the contexts and environment within which the person functions and interacts and requires a multidimensional and ecological approach that reflects the interaction of the individual with the environment, and the outcomes of that interaction with regards to independence, relationships, societal contributions, participation in school and community, and personal well being.

Id.

Finally, the AAMR’s FAQ subsection “What is Intelligence?” states that:
[intelligence refers to a general mental capability. It involves the ability to reason, plan, solve problems, think abstractly, comprehend complex ideas, learn quickly, and learn from experience. Although not perfect, intelligence is represented by Intelligent Quotient (IQ) scores obtained from standardized tests given by a trained professional. In regard to the intellectual criterion for the diagnosis of mental retardation, mental retardation is generally thought to be present if an individual has an IQ test score of approximately 70 or below. An obtained IQ score must always be considered in light of its standard error of measurement, appropriateness, and consistency with administration guidelines. Since the standard error of measurement for most IQ tests is approximately 5, the ceiling may go up to 75. This represents a score approximately 2 standard deviations below the mean, considering the standard error of measurement. It is important to remember, however, than an IQ score is only one aspect in determining if a person has mental retardation. Significant limitations in adaptive behavior skills and evidence that the disability was present before age 18 are two additional elements that are critical in determining if a person has mental retardation.

Id.

III. Eligibility Determination - and Appeals Process
Under 115 CMR. 6.02(3), the Department determines an individual’s eligibility through the use of a Regional Eligibility Team. The determination is based on an analysis of the information submitted in support of the application. The process includes an interview with the applicant and significant persons in her life. The determination is made pursuant to 115 CMR 6.04 through 6.06. Upon completion of the eligibility determination, the Regional Eligibility Team prepares and mails a letter to the applicant, the applicant’s guardian, if any, and the Area Director or her designee. 115 CMR 6.03(1).
An initial determination of eligibility may be appealed through the “fair hearing” process provided for in 115 CMR 6.33(2). Following the hearing, the hearing officer drafts “a recommended decision which shall include a summary of the evidence presented, findings of fact, proposed conclusions of law, the recommended decision, and the reasons for the decision.” 115 CMR 6.33(2)(h). “The findings of fact in the recommended decision shall be binding on the Commissioner. The Commissioner may modify the conclusions of law and decision where the conclusions or decision are: in excess of the agency’s statutory authority or jurisdiction; based on an error of law; arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” 115 CMR 6.33 (2)(i).

DISCUSSION

It is settled law that under G.L.c. 30A, §14, a court may set aside or modify a board’s decision if it violates constitutional provisions, is based upon an error of law, is unsupported by substantial evidence, or is “arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with the law.” G.L.c. 30A, §14(7). “An agency’s interpretation of its own regulation and statutory mandate will be disturbed only ‘if the interpretation is patently wrong, unreasonable, *727 arbitrary, whimsical, or capricious.’ ’’ Box Pond Ass’n v. Energy Facilities Siting Bd., 435 Mass. 408, 416 (2001), citing TBI, Inc. v. Bd. of Health, 431 Mass. 9, 17 (2000). Simply stated, a judicial review of an agency’s decision is a determination of whether a decision was reached within the proper bounds of agency decision-making enumerated in the statute. Brookline v. Comm’r of the Dept. of Envt'l Quality Eng’g., 298 Mass. 404, 410 (1986). Accordingly, a court must give “due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it.” Id., quoting G.L.c. 30A, §14(7). “Nonetheless, the principle of deference is not one of abdication, and a regulation that is irreconcilable with an agency’s enabling legislation cannot stand.” Nuclear Metals, Inc. v. Low-Level Radioactive Waste Mgmt. Bd., 421 Mass. 196, 211 (1995). Applying these standards, I consider the Plaintiffs challenge to the Department’s decision. The burden is on Melican, as the moving party, to establish that the Department’s decision is invalid on one or more of the grounds alleged. Bankers Life & Cas. Co. v. Comm’r of Ins., 427 Mass. 136, 138-39 (1998); Bagely v. Contributory Ret. App. Bd., 397 Mass. 255, 258 (1986).
The Department’s regulation enumerates four instances where the Commissioner may modify a hearing officer’s decision; where the decision was: (1) in excess of the agency’s statutory authority or jurisdiction; (2) based upon an error of law; (3) arbitrary, capricious, an abuse of discretion; or (4) otherwise not in accordance with the law. 115 CMR 6.33(2) (i). It is undisputed by the Department that Melican satisfies two of the Department’s three eligibility criteria under 115 CMR 6.04. She is domiciled in the Commonwealth and she is in need of specialized supports in three of the seven adaptive skill areas enumerated in 115 CMR 6.04(1) (c). Thus, the only issue before this Court is whether the Hearing Officer’s conclusion that Melican is “a person with mental retardation” is consistent with the requirements of 115 CMR 2.01 and 6.33(2)(i). Even if the Department or this Court would have reached a different determination in a de novo review of the Plaintiffs appeal, the Commissioner is bound by the decision and conclusions of law unless they are unreasonable, inconsistent with the law, an abuse of discretion, and otherwise not in accordance with the law. 115 CMR 6.33(2)(i).
The Hearing Officer considered three different IQ scores (80, 83, and 75) from three different IQ tests. The Department argues that the Hearing Officer inaccurately “cobbled” together multiple statistical theories in order to lower the Plaintiffs first two IQ scores within a range — presumably 75 or below — which would satisfy Department eligibility criteria. For the sake of argument only, this Court assumes that the Hearing Officer misapplied statistical theories — including the “Flynn Effect” and the standard error of measurement — in her analysis of the two older and less accurate scores of 80 and 83. However, the Hearing Officer found the most recent test, the 2004 WAISIII on which Melican scored a 75, the most accurate and determinative. She explicitly stated in her decision that “the most reliable IQ score to consider is the one the [Plaintiff] obtained on the WAIS-III administered in 2004.1 therefore gave the most weight to that test result. Taking into account the standard error of measurement of plus or minus five (5) points, the [Plaintiffs] Full Scale IQ score of 75 falls within the AAMR definition of mental retardation. I find this to be the case despite Dr. Holloway’s statement in his report that the results of his evaluation failed to support a diagnosis of mental retardation.”
This Court notes that nowhere in G.L.c. 123B, the Department’s regulations, or the AAMR’s definition of mental retardation does it say that a score over 75 automatically and permanently disqualifies an applicant from consideration for Department eligibility. In fact, IQ scores are neither mentioned in G.L.c. 123B nor any Department regulation found in the Record. The Hearing Officer, pursuant to the Department’s own regulations, based her decision on the definitions of mental retardation from: (1) G.L.c. 123B; (2) 115 CMR 6.04; and (3) the AAMR. This Court reviews each of those definitions, in turn, to determine whether the Hearing Officer’s interpretation of the applicable definitions of mental retardation was reasonable, in accordance with the law, and within her discretion.
First, G.L.c. 123B defines mental retardation as a person who, “as a result of inadequately developed or impaired intelligence, as determined by clinical authorities as described in regulations of the department, is substantially limited in [her] ability to learn or adapt, as judged by established standards available for the evaluation of a person’s ability to function in the community.” (Emphasis added.) Id. Second, Department regulations define mental retardation as “consistent with the currently (1994) accepted clinical authority of the [AAMR], substantial limitations in present functioning . . . manifested by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safely, functional academics, leisure and work.” 115 CMR 2.01. (Emphasis added.) Third, the most detailed definition of mental retardation — and the one most heavily relied upon by the Hearing Officer — is that of the AAMR. The AAMR definition states that mental retardation is a “disability characterized by significant limitations both in intellectual function and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills.” Again, this Court finds no reference to a bright-line IQ cut-off score on which the Department’s argument depends.
*728 The only reference to IQ scores in the context of the definition of mental retardation is found in the aforementioned AAMR FAQ section, which the Hearing Officer also relied upon in reaching her decision and conclusions of law. Specifically, the FAQ section discusses a totality of the circumstances approach in defining mental retardation. The FAQ section stresses a contextual and multidimensional approach to elucidate mental retardation and intelligence. The FAQ section’s discussion of IQ scores bears repeating:
In regard to the intellectual criterion for the diagnosis of mental retardation, mental retardation is generally thought to be present if an individual has an IQ test score of approximately 70 or below. An obtained IQ score must always be considered in light of its standard error of measurement, appropriateness, and consistency with administration guidelines. Since the standard error of measurement for most IQ tests is approximately 5, the ceiling may go up to 75. This represents a score approximately 2 standard deviations below the mean, considering the standard error of measurement. It is important to remember, however, than an IQ score is only one aspect in determining if a person has mental retardation. Significant limitations in adaptive behavior skills and evidence that the disability was present before age 18 are two additional elements that are critical in determining if a person has mental retardation.
(Emphasis added.)
Pursuant to 115 CMR 6.33(2), the Hearing Officer reached her decision, in part, through an interpretation of 115 CMR 2.01, 115 CMR 6.04, and the AAMR definition on mental retardation, each of which were within her charge. An interpretation of the 115 CMR 2.01 and the AAMR definitions of mental retardation that allows for an IQ score of 75, taking into account the standard error of measurement, as well as a host of other factors indicating significant subaverage intellectual functioning and limitations in adaptive skill areas, is reasonable and consistent with the law. Therefore, the conclusions of law and decision of the Hearing Officer should not have been disturbed. The Hearing Officer’s decision satisfied the requirements of 115 CMR 6.33(2) and where, as here, her decision was not based upon an error of law, arbitrary, capricious, or an abuse of discretion, and it should not have been disturbed by the Commissioner.
Therefore, pursuant to G.L.c. 30A, §14, the Commissioner’s decision to modify the Hearing Officer’s reasonable decision is itself based upon an error of law, unsupported by substantial evidence, unwarranted by facts found by this Court on the record, and an abuse of discretion.

ORDER

For the foregoing reasons, it is therefore ORDERED that the Plaintiffs motion for judgment of the pleadings be ALLOWED. The decision of the Commissioner to deny the Plaintiffs appeal of her eligibility under 115 CMR 6.04 is REVERSED.

 Available at http://www.aamr.org/Policies/faq_mental_retardation.shtml.