628        48 Mass. App. Ct. 628 (2000)

Trust Insurance Company *v.* Commissioner of Insurance (No. 2).

# TRUST INSURANCE COMPANY *vs.* COMMISSIONER OF INSURANCE (No. 2) & others.[1]

No. 98-P-828.

Suffolk. October 12, 1999. - February 24, 2000.

Present: KASS, KAPLAN, & GELINAS, JJ.

*Motor Vehicle,* Insurance. *Insurance,* Motor vehicle insurance. *Administrative Law,* Agency's interpretation of regulation. *Due Process of Law,* Administrative hearing.

The Commissioner of Insurance correctly concluded that the subjective motivation of an insurance company in terminating an exclusive representative producer (ERP), viz., an insurance agent or broker, is immaterial under the rules of the Commonwealth Automobile Reinsurers, and substantial evidence supported the commissioner's involuntary assignment of the unattached ERP to another servicing carrier. [631-633]

Where a wholly-owned subsidiary of an insurer was not an exclusive representative producer (ERP) and did not have a servicing carrier, substantial evidence supported the decision of the Commissioner of Insurance to make an involuntary assignment to a servicing carrier of the unattached ERP that purchased the subsidiary's book of business. [633]

Where a servicing carrier (insurer) terminated its contractual relationship with an exclusive representative producer (ERP), viz., a broker or agent, conformably with the rules of the Commonwealth Automobile Reinsurers, the subjective motivation behind the termination was not a subject for consideration on administrative or judicial review. [633-634]

In a proceeding under rule 20 of the rules of the Commonwealth Automobile Reinsurers, in which there were no disputed issues of material fact, the Commissioner of Insurance properly exercised discretion in not holding an evidentiary hearing [634-635] and in denying a party's motion to take prehearing depositions [635].

CIVIL ACTION commenced in the Superior Court Department on July 26, 1996.

A motion for judgment on the pleadings was heard by *Charles M. Grabau, J.*

[1]Commonwealth Automobile Reinsurers, Marietta M. Paquette Insurance Agency, Inc., and Allan R. Zagami, doing business as New Main Street Insurance Agency.

*Francis J. Sally* for the plaintiff.

*Mark G. Matuschak* (*Robert W. Mahoney* with him) for Commonwealth Automobile Reinsurers.

*Pierce O. Cray*, Assistant Attorney General, for Commissioner of Insurance.

KASS, J. For the third time within a year Trust Insurance Company (Trust) has brought before us a controversy with the Commissioner of Insurance (commissioner) and Commonwealth Automobile Reinsurers (CAR), see *Trust Ins. Co.* v. *Commonwealth Auto. Reinsurers*, 46 Mass. App. Ct. 657 (1999), and *Trust Ins. Co.* v. *Commissioner of Ins., ante* 617 (2000). Trust, in the current case, claims that a judge of the Superior Court erred in denying its motion for judgment on the pleadings and in affirming the commissioner's decision upholding the appointment of two exclusive representative producers (ERPs) to Trust. We affirm.

1. *Factual and procedural background.* Among CAR's functions in its role of ensuring the availability of automobile insurance to all qualified Massachusetts drivers is guaranteeing that all drivers in the Commonwealth have access to agents or brokers who can provide such insurance. See G. L. c. 175, § 113H(A). Agents and brokers who have no insurance company that will voluntarily associate with them — because their books of business are too likely to result in financial loss — can apply to CAR for appointment to an involuntary relationship with an insurance company. Such agents and brokers are known as ERPs; insurance companies entering into such a relationship are called servicing carriers.

CAR's Rules of Operation require that a servicing carrier have ERP exposures proportionate to its total share of the insurance market. Companies with a share of the ERP market smaller than their market share — undersubscribed companies — are the first to receive additional ERP assignments from CAR. On March 31, 1993, CAR notified Trust, an undersubscribed company, that it would be assigned several new ERPs, including the Marietta M. Paquette Insurance Agency, Inc. (Paquette), and Allan R. Zagami, doing business as New Main Street Insurance Agency (Zagami).

Paquette is an insurance agency located in Lowell that was formerly owned by Mario Espinosa, who operated the Mario L. Espinosa Insurance Agency (Espinosa) as an ERP assigned to Safety Insurance Company (Safety). In August, 1992, Safety

placed Espinosa on probation because it had failed to remit premiums it owed Safety.[2] In February, 1993, after Espinosa notified Safety that it was selling its book of business to Paquette, Safety terminated Espinosa as an ERP for failure to remit payments, failure to cooperate with Safety and CAR during audits and investigations, and violation of premium collection standards. Espinosa appealed the termination to CAR, but pursuant to a settlement between Espinosa and Safety, Safety issued a letter of nonindebtedness to Espinosa (a necessary release if Mario Espinosa was to be able to sell his agency), and Espinosa withdrew the appeal.

Zagami, an insurance agency in Worcester, applied to CAR for appointment as an ERP on October 10, 1992, indicating that it intended to purchase a book of business from the New Main Street Liquidation Company (NMS Liquidation), a wholly owned subsidiary of Commerce Insurance Company (Commerce). Commerce had been the servicing carrier for the New Main Street Insurance Agency (New Main), which NMS Liquidation acquired from Stanley Kozaczka in 1991. However, Commerce terminated New Main as an ERP in January, 1991, because of premiums it owed Commerce and Kozaczka's financial improprieties. It was after the termination of New Main's ERP status that Commerce created NMS Liquidation to service New Main's book of business in an attempt to recoup some of the losses from New Main's default. Commerce serviced the active exposures written by NMS Liquidation and reported that business as ERP business as late as May, 1993. In June, 1993, Zagami acquired ownership of NMS Liquidation's book of business pursuant to a purchase and sale agreement that required Zagami to obtain from CAR an ERP assignment to an insurance company other than Commerce.

In May, 1993, Trust notified CAR that it would not accept Paquette and Zagami as ERPs, because it believed that those agencies should have been assigned to Safety and Commerce respectively. On May 17, 1993, the review panel of the governing committee of CAR (review panel) held a hearing on Trust's refusal to accept the two ERPs; the review panel voted to uphold the assignments.

Trust appealed the decision of the review panel to the commissioner pursuant to rule 20(B) of the CAR Rules of Opera-

---

[2]Safety also had placed Espinosa on probation in August, 1990.

tion.[3] Paquette and Zagami were added as parties to the appeal. Trust also filed a complaint with the commissioner against CAR, Safety, and Commerce pursuant to G. L. c. 175, § 113H(E), ninth par., and art. X of the CAR Plan of Operation, which the commissioner consolidated with Trust's rule 20 appeal. The commissioner later dismissed those claims for lack of jurisdiction, leaving only the rule 20 appeal against CAR, Paquette, and Zagami.

After the submission of memoranda and several conferences with the parties, the presiding officer assigned to the case determined that no material facts were disputed and ordered the parties to brief the legal issues.[4] On June 27, 1996, the commissioner upheld the appointment of Paquette and Zagami to Trust. Trust appealed that decision to the Superior Court, which in a judgment entered on January 15, 1998, affirmed the commissioner and denied Trust's motion for judgment on the pleadings. It is from this judgment that Trust now appeals. See G. L. c. 30A, § 14; G. L. c. 175, § 113H.

2. *Assignment of the Paquette agency.* If the commissioner's interpretation of CAR's rules is reasonable and her findings are supported by substantial evidence, see *Massachusetts Med. Soc.* v. *Commissioner of Ins.*, 402 Mass. 44, 62 (1988), "we will not substitute our own judgment for hers." *Automobile Insurers Bureau of Mass.* v. *Commissioner of Ins.*, 415 Mass. 455, 457-458 (1993). "Substantial evidence is 'such evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Blue Cross & Blue Shield of Mass., Inc.* v. *Commissioner of Ins.*, 420 Mass. 707, 710 (1995), quoting from *Boston Edison Co.* v. *Selectmen of Concord*, 355 Mass. 79, 92 (1968). G. L. c. 30A, § 1.

Trust argues that Paquette should have been assigned to Safety as an ERP because Paquette purchased a book of busi-

---

[3]Rule 20(B) provides that "[a]ny formal Governing Committee ruling [issued pursuant to rule 20(A)] may be appealed to the Commissioner by filing notice of appeal with [CAR] and the Commissioner within thirty days after the date of the ruling's issuance."

[4]Trust earlier had asked to pursue discovery in the case. An order issued by the presiding officer and affirmed by the commissioner on September 1, 1994, denied Trust's motion to take depositions, but encouraged Trust to pursue voluntary discovery and allowed Trust to serve requests for the production of documents. The presiding officer also rejected Trust's argument that the commissioner ought to conduct a de novo evidentiary hearing. Trust did not attempt to conduct voluntary discovery.

ness that Safety previously serviced. Under CAR rule 14(A)(2)(e), when an agent or broker which has an ERP appointment to a servicing carrier sells its book of business to an agent or broker who lacks a relationship with a servicing carrier, the appointment inures to the purchaser. While acknowledging that Safety terminated Espinosa before the transfer of its business to Paquette took place, Trust nevertheless maintains that Safety took advantage of Espinosa's sale of its book of business to terminate Espinosa's ERP appointment and free itself from an unprofitable relationship.

Specifically, Trust contends that the commissioner ignored Safety's motivations in terminating Espinosa as an ERP. However, Trust admits that Espinosa failed to remit premiums to Safety, failed to cooperate with Safety and CAR during audits and investigations, and violated premium collection standards — conduct that constitutes grounds for termination under CAR's rules.[5] Trust also admits that Safety terminated Espinosa as an ERP before the sale to Paquette, leaving no servicing carrier relationship that would attach to Paquette and, thus, making Paquette eligible for assignment to Trust.

The trial judge decided that the CAR rules governing the termination of ERPs do not refer to the subjective motivation of the servicing carrier in terminating an ERP, and that the commissioner properly concluded that Safety terminated the agency status of Espinosa in accordance with CAR's rules. Indeed, the rules set forth an objective list of standards that, if violated by the agent or broker, give the servicing carrier the right to terminate the ERP, without regard to what actually prompts the exercise of that right. We are of opinion that the commissioner's

---

[5]CAR rules 13(B)(3)(f) and 14(G)(1) govern the termination of ERPs. Rule 13(B)(3)(f) states that "Servicing Carriers shall be entitled to immediately terminate . . . a Representative Producers [*sic*] contract to bind coverage on behalf of the Servicing Carrier when any of the conditions listed below exist." These conditions include the failure to remit payments timely to the servicing carrier and the failure to assist the servicing carrier during an audit. Rule 14(G)(1) states that "[a] material and substantial breach of contract will be deemed to have occurred where a finding has been made that the [ERP] has on three distinct occasions committed any of the following acts or omissions or on any one occasion has committed a combination of any three or more of the following acts or omissions: a. Failure to remit payments to a Servicing Carrier on a timely basis in accordance with CAR Rules . . . and those prescribed by the Servicing Carrier. . . . d. Failure to assist the Servicing Carrier during any audit or investigation of the motor vehicle business of the [ERP]."

decision, that a servicing carrier's subjective motivation in proceeding with the termination of an ERP is immaterial under the CAR rules, is based upon a correct interpretation of CAR's rules.

3. *Assignment of the Zagami agency.* A similar result obtains regarding Zagami. Trust argues that Commerce terminated New Main to rid itself of servicing unprofitable business and that this termination was ineffective because Commerce continued to service New Main's book of business through NMS Liquidation, making NMS Liquidation an ERP with Commerce as its servicing carrier, a relationship that continued until Zagami purchased NMS Liquidation's book of business.

The Superior Court judge affirmed the commissioner's determination that NMS Liquidation was not an ERP — and, therefore, that there was no ERP relationship that could have inured to Commerce. There was no such relationship because NMS Liquidation never had been designated as such by CAR in accordance with rule 2. Rule 2 defines an ERP as an agent or broker, without an existing voluntary agency relationship with a servicing carrier, who has been appointed by CAR to a servicing carrier to certify motor vehicle insurance policies.

NMS Liquidation did not have a servicing carrier at the time Zagami purchased it. Indeed, as Trust admits by describing it as a "wholly owned subsidiary of Commerce," NMS Liquidation was not even an ERP. Furthermore, the record does not indicate, nor does Trust contend, that CAR ever appointed NMS Liquidation as an ERP as required by rule 2. Although Commerce continued to service New Main's book of business in hopes of recouping some of its financial losses, Commerce previously had terminated New Main as an ERP because of defalcations by its former principal. That Commerce reported this business as ERP business is without moment: the CAR rules make no provision for appointment of a "book of business" as an ERP.

Regarding both Paquette and Zagami, Trust confuses books of business with the insurance agents and brokers who service those books of business. Only agents and brokers can be ERPs; only agents and brokers can be terminated as ERPs. The CAR rules governing ERP termination concern only acts or omissions by the agents or brokers, and do not refer to any quality of the business that those agents or brokers service. Whether a servicing carrier in terminating an ERP considers the profitability of

that ERP's business is immaterial to determining the propriety of the termination.[6]

Essentially, Trust urges us to examine whether the servicing carrier's reason for terminating an ERP was a pretext. In personnel employment and criminal law contexts, courts do look at pretext because a showing of pretext unmasks the apparent legitimate explanation of the adverse hiring decision, search, or arrest. See, e.g., *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 446 (1995) (employment law); Smith, Criminal Practice and Procedure § 240 (2d ed. 1983 & Supp. 1999) (pretextual arrests and searches). That sort of inquiry does not generally apply to the termination of essentially contractual arrangements conformably with the rules governing those arrangements. The commissioner and the Superior Court judge were correct in declining to read CAR's rules as considering the subjective motivations behind ERP terminations for causes set out in those rules. Cf. *Marco* v. *Green*, 415 Mass. 732, 739 (1993) ("Where the statute is not ambiguous or couched in terms suggesting that we must look beyond its express language, we construe the statute in accordance with its plain meaning").

4. *Due process.* Trust argues that the hearing before CAR did not provide it with a full and fair opportunity to be heard, violated due process, and, thus, was not a "proper hearing" under G. L. c. 175, § 113H(E).[7] No due process right to an evidentiary hearing exists when the material facts that are legally dispositive are uncontested. *Federal Power Commn.* v. *Texaco, Inc.*, 377 U.S. 33, 39 (1964). *Massachusetts Outdoor Advertising Council* v. *Outdoor Advertising Bd.*, 9 Mass. App. Ct. 775, 784-789 (1980). The Superior Court judge ruled that it was within the commissioner's discretion whether to hold an evidentiary hearing and, as there were no material facts at issue in the case (the motivation of Safety and Commerce being irrelevant), it was a proper exercise of the commissioner's discretion not to

---

[6]Trust's characterization of the Paquette and Zagami agencies as "bad books of business" is tautological in view of their status as ERPs. Were they profitable, those agents and brokers would have at least one voluntary association with an insurance company and, therefore, would not be ERPs.

[7]General Laws c. 175, § 113H(E), ninth par., states, in part, that "[t]he commissioner shall . . . cause a proper hearing . . . to be held and shall issue such orders as [the commissioner] then deems appropriate."

hold such a hearing.[8] The papers and pleadings filed conclusively show that an evidentiary hearing could serve no useful purpose.

Trust also argues that, had it been permitted to take discovery, it could have determined whether Safety violated CAR rules when it terminated Espinosa and whether Commerce serviced NMS Liquidation as an ERP. We think the Superior Court judge correctly decided that the commissioner's denial of Trust's motion to take depositions did not violate Trust's due process rights, the commissioner having permitted Trust to take voluntary discovery and make requests for the production of documents — avenues of discovery that Trust did not pursue. See *Matter of Tobin*, 417 Mass. 81, 87 (1994) ("Parties to judicial or quasi-judicial proceedings . . . are not entitled to pretrial discovery as a constitutional right").

The judgment denying Trust's motion for judgment on the pleadings and affirming the decision of the commissioner is affirmed.

*So ordered.*

---

[8]Rule 20(B), insofar as pertinent, provides: "The Commissioner may approve, modify, amend or disapprove the ruling or direct the Governing Committee to reconsider the ruling. In addition, the Commissioner may issue any other appropriate order, including granting the aggrieved party a new hearing."