Gants, Ralph D., J.
The plaintiff, the Commerce Insurance Company (“Commerce”), subsequently joined by various plaintiff intervenors, has filed this action claiming that the defendant Commissioner of Insurance (“Commissioner”) exceeded her statutory authority when she issued her Order on December 31, 2004, entitled “Revision of the Rules of Operation of the Commonwealth Automobile Reinsurers” (“Revised CAR Rules"), which created an Assigned Risk Plan to replace the existing plan for insuring automobile drivers in the so-called involuntary market for automobile insurance. In short, Commerce contends that the discretion granted to the Commissioner under the enabling legislation, G.L.c. 175, §113H, does not extend so far as to permit her to create an Assigned Risk Plan, since the Legislature intended to prohibit this 1ype of plan when it earlier amended §113H. Commerce now moves for judgment on the pleadings, asking this Court to annul the December 31, 2004 Order and the Assigned Risk Plan it created. After hearing, Commerce’s motion for judgment on the pleadings is ALLOWED. The December 31,2004 Order is hereby ANNULLED and the Revised CAR Rules issued pursuant to that Order are hereby VACATED.
BACKGROUND
Under Massachusetts law, every person who drives a motor vehicle is required to have at least a minimum amount of automobile insurance. G.L.c. 90, §34J. If a licensed driver does not obtain such insurance, he is prohibited from driving and the vehicle’s registration will be revoked. G.L.c. 90, §§34H & 34J. There are, however, many drivers in Massachusetts, as in every state, who cannot find an insurance company willing to insure them. While many of these drivers have a poor driving record, many others have an excellent driving record but are viewed as unattractive insurance risks because they live in urban neighborhoods with a high incidence of car theft and vandalism. Indeed, 26.8 percent of the drivers presently in the involuntary market in Massachusetts have had no at-fault accidents and no more than one minor traffic violation in the past six years.
Historically, throughout the various fifty states, three different approaches have been taken to provide automobile insurance to those drivers whom no automobile insurance company voluntarily wishes to insure;
1. An Assigned Risk Plan, in which drivers who cannot find an automobile insurance company willing to insure them are randomly distributed among the automobile insurance companies licensed to do business in the state, generally in accordance with each company’s share of the voluntary automobile insurance market. Under an Assigned Risk Plan, an insurance company is permitted to refuse to offer voluntary automobile insurance to a driver and may tell him so, but must accept that driver and service his policy if he is involuntarily assigned to that company by the Plan. Once involuntarily assigned to an insurance company, the company bears the entire risk of any net losses that may be incurred by insuring that driver.
2. A Reinsurance Plan, in which any insurance company licensed to do business in the state must, with narrow exceptions, accept every qualified driver who applies for automobile insurance but may “cede” those drivers whose risks it does not wish to insure to a reinsurance pool. The insurance company continues to service those drivers it has ceded, but any premiums paid and losses arising from these drivers are treated as having been transferred to the reinsurance pool. The net losses suffered by the reinsurance pool from all ceded drivers are shared among all the insurance companies licensed to do business in the state, generally in accordance with each company’s market share of non-ceded drivers.
3. A Joint Underwriting Plan, in which drivers who cannot find an automobile insurance company willing to insure them are accepted and serviced by a joint underwriting association created by all the insurers licensed to do business in the state, with the net losses suffered by the joint underwriting association shared by those insurers.
See generally Report of Towers Perrin Tillinghast, “Analysis of the Commonwealth Automobile Reinsur-ers,” (April 2004) at 10-12 (“Tillinghast Report”).
These three types of plans each attempt equitably to allocate among the state’s automobile insurance companies the financial burden imposed by the need to insure drivers whom no one wishes to insure, but they do so in fundamentally different ways, with significant practical differences both to the insurance *443 companies and to the drivers in this involuntary market. With respect to the insurance companies:
Under an Assigned Risk Plan, the drivers themselves, with the risks associated with those drivers, are randomly and equitably allocated among the insurance companies. Under the Reinsurance Plan and the Joint Underwriting Plan, the net losses arising from these risks, not the risks themselves, are equitably allocated. Consequently, under an Assigned Risk Plan, the servicing insurance company has a greater financial incentive to identify fraudulent claims from the drivers in the involuntary pool because it bears the entire cost of these claims. Under the Reinsurance Plan, this financial incentive is diluted because the servicing company bears only its proportional share of the net losses from these claims.
Under an Assigned Risk Plan and the Reinsurance Plan, the insurance companies themselves service these drivers. Under the Joint Underwriting Plan, these drivers are serviced by an association created specifically to service these drivers.
With respect to the drivers in the involuntary market:
Under an Assigned Risk Plan and a Joint Underwriting Plan, these drivers must apply to and be rejected by one or more insurance companies before they are assigned to a company that must service their policy. Therefore, these drivers may not be insured by the company of their choice. Moreover, regardless of whether or not they are content with their servicing insurer, they know that they are in the involuntary insurance market. Under the Reinsurance Plan, each insurance company must service every qualified applicant for insurance, regardless of the risk of loss posed by that applicant; this is described in the industry as a “take all comers” rule. The insurance company may cede the risk from a driver if it is unwilling to bear that risk alone, but it must service his policy. Consequently, under the Reinsurance Plan, the driver, regardless of the risk he poses, chooses the insurance company he wishes to service his policy and generally would not know whether he is in the voluntary or involuntary market, because the insurance company would not tell him whether it has ceded his risk to the reinsurance pool.
Under a Reinsurance Plan, the driver need apply to only one insurance company and can immediately obtain insurance upon completion of his application and payment of his premium, because that company is required to service his policy, regardless of the risk. Under an Assigned Risk Plan or a Joint Underwriting Plan, the driver may need to apply unsuccessfully to one or more insurance companies before he would eventually be assigned to a particular company (under the Assigned Risk Plan) or to the joint underwriting association (under the Joint Underwriting Plan), and may be without automobile insurance during the interim.
In 1953, the Massachusetts Legislature enacted Chapter 570, entitled “An Act Relative to the Establishment of the Massachusetts Highway Safety Committee and to Provide a Plan for the Insuring of Risks Requiring Insurance for the Operation of Motor Vehicles.” Section 5 of Chapter 570, incorporated into the General Laws as G.L.c. 175, §113H, established an Assigned Risk Plan by declaring:
Insurance companies undertaking to issue motor vehicle liability policies . . . shall cooperate in the preparation and submission of a plan for the fair and equitable apportionment among such insurance companies of applicants for insurance who are in good faith entitled to and are unable to procure through ordinary methods motor vehicle liability insurance ... Such a plan shall provide reasonable rules governing the fair and equitable distribution of risks or losses by direct insurance, reinsurance, or otherwise . . .
When such plan or amendments thereto have been approved or promulgated, no insurer shall thereafter issue a motor vehicle liability policy or bond, unless such insurer shall participate in such an approved or promulgated plan . . .
G.L.c. 175, §113H (1953) (emphasis added). See generally Timothy H. Gailey, Commissioner of Insurance, “CAR Reform: Shaping the Residual Market for the 1990s, A Report Prepared in Accordance with Section 66 of Chapter 273 of the Acts of 1988,” (September 1989) at 17-19 (“Gailey Report”).
As former Insurance Commissioner Timothy Gailey detailed in his Report:
There were a number of problems and abuses associated with the assigned risk plan in Massachusetts. The requirement that insureds be rejected by several companies resulted in delays and inconvenience for consumers in obtaining coverage. The separate classification of assigned risk drivers created a stigmatized class of drivers. There was also a great deal of abuse of the assigned risk plan system by brokers. For example, there were brokers who rubber-stamped policies “rejected” to circumvent the requirement that applicants receive a number of insurance company rejections ... In 1971 the Division of Insurance held approximately 70 hearings resulting in the revocation of the licenses of over 50 Plan brokers because of abuses.
Gailey Report at 18-19.
In 1973, the Legislature replaced the Assigned Risk Plan it had created in 1953 with a Reinsurance Plan. Gailey Report at 19. The purpose of the new legislation was manifest from the title of the new Chapter 551— "An Act Restricting the Right of Insurance Companies to Cancel or Refuse to Issue Automobile Insurance Policies and Establishing a Plan of Reinsurance *444 Among the Companies." G.L.c. 175, §113E (1973). The “take all comers” rule was enacted by replacing the former G.L.c. 175, §113E, which had prohibited racial discrimination in the issuance of motor vehicles policies, with this new provision:
No insurance company shall refuse to issue ... a motor vehicle policy... to any person applying in good faith for such policy or bond, on a standard form prescribed by the commissioner for any reason; except that no insurance company shall be required to issue such policy... if:
1. The applicant or any person who usually drives the motor vehicle has failed to pay an insurance company any motor vehicle insurance premiums due or contracted during the preceding twelve months; or
2. Any person who usually drives the motor vehicle does not hold or is not eligible to obtain an operator’s license.
G.L.c. 175, §113E (1973). As a result of this statute, an insurance company could not refuse any applicant for automobile insurance who had timely paid his premium and held a valid driver’s license, no matter how poor his driving record. G.L.c. 175, §113E (1973); Massachusetts Motor Vehicle Reinsurance Facility v. Commissioner of Insurance, 379 Mass. 527, 528 n.3 (1980).
The Assigned Risk Plan was replaced with a Reinsurance Plan by replacing the former G.L.c. 175, §113H with a revised provision that declared in pertinent part:
Insurance companies undertaking to issue motor vehicle liability policies . . . shall cooperate in the preparation and submission of a plan for the fair and equitable apportionment among such insurance companies of premiums, losses or expenses, or any combination thereof incurred under policies issued to applicants which are reinsured through such plan . . .
Such plan shall provide reasonable rules governing the fair and equitable distribution of expenses and losses by reinsurance.
G.L.c. 175, §113H (1973) (emphasis added).
It is noteworthy to look carefully at the change of language chosen by the Legislature to reflect its abandonment of the Assigned Risk Plan and its establishment of a Reinsurance Plan:
While the 1953 legislation called for a plan providing for a “fair and equitable apportionment among such insurance companies of applicants for insurance” who were unable to procure motor vehicle liability insurance in the voluntary market, the 1973 legislation called for a plan providing a “fair and equitable apportionment among such insurance companies of premiums, losses or expenses, or any combination thereof’ of those reinsured through the plan;
While the 1953 legislation declared that the plan “shall provide reasonable rules governing the fair and equitable distribution of risks or losses by direct insurance, reinsurance, or otherwise,” the 1973 legislation provided that the “plan shall provide reasonable rules governing the fair and equitable distribution of expenses and losses by reinsurance.”
The subtlety of these changes should not disguise their importance. In an Assigned Risk Plan, the applicants who cannot obtain insurance in the voluntary market and the risks posed by those applicants are fairly and equitably distributed among the various insurance companies doing business in the Commonwealth. In a Reinsurance Plan, the net losses from insuring those in the involuntary market are fairly and equitably distributed among the various insurers.
Nor, apart from this subtle change in language, can there be any question that the purpose of the 1973 legislation was to mandate a Reinsurance Plan and abandon the Assigned Risk Plan. If the title of the legislation left any doubt, Section 7 of Chapter 551 would have eliminated it. Section 7 specifically provided that “the assigned risk plan in effect prior to [November 1, 1973] under the provisions of [G.L.c. 175, §113H and 1131] shall remain in full force and effect until the new plan authorized in said sections [G.L.c. 175, §113H and 1131], as amended by sections five and six of this act, is either approved or promulgated by the commissioner of insurance.” Acts of 1973, Ch. 551, §7. Moreover, the enactment of the “take all comers” provision is part and parcel of the change from an Assigned Risk Plan to a Reinsurance Plan because, in an Assigned Risk Plan, an insurance company is permitted to reject applicants and the rejected applicants are then shared among the various insurance companies. A “take all comers” rule is only consistent with a Reinsurance Plan, where the net losses from drivers in the involuntary market are shared among the various insurance companies, regardless of who is servicing those drivers. Not surprisingly, then, in view of this change in statutory mandate, in 1974, the Commissioner approved the Massachusetts Motor Vehicle Reinsurance Facility (“the Facility”), which instituted a Reinsurance Plan. Gailey Report at 19.
During the last year of the Assigned Risk Plan, the involuntary market in Massachusetts comprised roughly four percent of those insured. By 1975, after the Reinsurance Plan was instituted, the involuntary market grew to nearly fifteen percent of the market. In response to this increase and other changes in the automobile insurance market, the Facility prepared a new plan of operation, which permitted the rates for the involuntary market to be set higher than the voluntary market. Gailey Report at 21.
In 1977, the Legislature enacted Chapter 365, entitled “An Act Relative to the Rates Charged for Motor *445 Vehicle Insurance,” which required all insurers issuing policies which were reinsured through the plan to “use the manual of classifications, rules and rates, and rating plans filed by or on behalf of the plan...” G.L.c. 175, §113H (1977). This provision “prohibited rates for good risks in the Facility from exceeding the rates that would be used by each such risk’s insurer for that risk if such risk were not in the Facility.” Gailey Report at 21-22. The 1977 legislation also made a number of minor modifications to the Reinsurance Plan, such as permitting the plan to refuse to offer optional coverages, changing the composition of the governing committee that administered the plan, and barring any insurer that decreased its book of automobile business in Massachusetts by more than ten percent from the previous calendar year from continuing as a member of the governing committee.
Despite various statutory adjustments that were made to the Reinsurance Plan, the share of the involuntary market continued to grow, reaching nearly half of the overall market (47.7 percent) by 1983. Gailey Report at 19-23. On July 7, 1983, the Legislature enacted Chapter 241, entitled “An Act Further Regulating Motor Vehicle Insurance,” which created a hybrid between the Reinsurance Plan and a Joint Underwriting Plan. See Gailey Report at 23. The 1983 legislation, in replacing the old G.L.c. 175, §113H with a revised version, made a number of substantive changes to the Reinsurance Plan:
1. While before every insurance carrier serviced drivers in the involuntary market, the plan contemplated by the 1983 legislation provided that only some (but at least twenty) of the insurance carriers would service drivers in the involuntary market. G.L.c. 175, §113H(C). This was a variation on the more traditional Joint Underwriting Plan, in which a joint underwriting association is created by statute to service the involuntary market. Compare with Acts of 1985, Chapter 223, creating a joint underwriting association to issue liquor legal liability insurance.
2. Since not every insurance company serviced drivers in the involuntary market, the new legislation needed to address the possibility that a non-servicing carrier would choose not to insure an applicant. It did so by eliminating G.L.c. 175, §113E (1973), which had forbidden any insurance company from refusing to issue a motor vehicle policy to a qualified applicant (except one without a valid driver’s license or with unpaid premiums) and effectively replacing it with two provisions. The first required that the “plan” shall provide motor vehicle insurance to everyone (except those without a valid driver’s license or with unpaid premiums) who has been unable to obtain insurance in the voluntary market. G.L.c. 175, §113H(A) (1983). The second provided that “every licensed agent or broker shall be assigned to at least one service carrier,” who is required to “service such agent or broker under substantially the same contractual terms and conditions governing their normal agency relationship and may not endorse or declare that the policy is underwritten by the plan.” G.L.c. 175, §113H(C) (1983). As a result of these changes, a driver applying for insurance from a non-servicing carrier could be turned away but could then apply for insurance from a licensed agent or broker assigned to an insurance company servicing the involuntary market. The application made through the agent or broker must not only be accepted by the servicing insurance company to whom the agent or broker is assigned, but the insurance company is barred from endorsing or declaring that the policy has been underwritten by the plan. Id. In short, a servicing carrier is barred from rejecting a qualified applicant for insurance who applies through the broker or agent to whom the servicing carrier is assigned, and is also barred from telling the applicant that he has been accepted but ceded to the involuntary market. For all practical purposes, for servicing carriers, this was essentially a “take all comers” rule, provided the comers came through the broker or agent assigned to it.
3.While only some of the motor vehicle insurance companies doing business in Massachusetts would service the involuntary market, the plan would provide, as before, “for the fair and equitable apportionment among such insurance companies of premiums, losses, or expenses, or any combination thereof . . .” G.L.c. 175, §113H(A). This language was retained from the 1973 legislation, reflecting that this hybrid was still essentially a Reinsurance Plan, which equitably allocated losses among all insurance companies (both servicing and non-servicing), rather than an Assigned Risk Plan, which equitably allocated applicants and their risks.
As a result of the 1983 legislation, a new plan was created which replaced the Facility with this new hybrid, known as the Commonwealth Automobiles Reinsurers (“CAR”). Gailey Report at 23. As then-insurance Commissioner Gailey wrote in 1989:
CAR is similar to a reinsurance facility in that it is a loss-sharing mechanism — all premiums, expenses and losses on ceded business are shared by all the companies. However, unlike a reinsurance facility, there are a limited number of companies acting as servicing carriers . . . The Legislature apparently expected that limiting the number of servicing carriers would result in more efficient and coordinated anti-fraud efforts in the residual market and a reduction in the number of cessions.
Galley Report at 23-24.
The Appeals Court has succinctly described how CAR implemented the statutory requirement that every licensed agent or broker be assigned to a servicing carrier:
*446 Among CAR’s functions in its role of ensuring the availability of automobile insurance to all qualified Massachusetts drivers is guaranteeing that all drivers in the Commonwealth have access to agents or brokers who can provide such insurance. See G.L.c. 175, §113H(A). Agents and brokers who have no insurance company that will voluntarily associate with them — because their books of business are too likely to result in financial loss — can apply to CAR for appointment to an involuntary relationship with an insurance company. Such agents and brokers are known as ERPs; insurance companies entering into such a relationship are called servicing carriers. CAR’s Rules of Operation require that a servicing carrier have ERP exposures proportionate to its total share of the insurance market. Companies with a share of the ERP market smaller than their market share — undersubscribed companies — are the first to receive additional ERP assignments from CAR.
Trust Insurance Company v. Commissioner of Insurance, 48 Mass.App.Ct. 628-29 (2000). As of 2004, there were 750 ERPs in the Massachusetts automobile insurance market and they wrote roughly 25 percent of the automobile policies in this Commonwealth. See CAR Proposed Changes to the Rules of Operation (Nov. 23, 2004) at 6 n.7.
While each servicing carrier was required to be assigned ERPs that would provide it with policyholders in the involuntaiy market roughly equal to that carrier’s share of the voluntary market, it became apparent over time that the risks posed by each ERP were not equal — some ERPs had clienteles with high risk ratios while other ERPs had clienteles with low risk ratios. While the average ERP loss ratio for the five-year period from 1996-2000 was 104 percent, some insurance companies had ERPs with loss ratios as low as 75 percent while others had ERPs with loss ratios as high as 200 percent. See Letter of Attorney General Thomas Reilly to Commissioner of Insurance Julianne Bowler, June 25, 2002 at 2 & Table 1. As a result, an insurance company with low risk ERPs could prosper, while an insurance company with high risk ERPs would falter or even fold. “Of the ten companies with the worst ERP loss ratios during this period (greater than 114%), two became insolvent, three were acquired by other insurers or departed from Massachusetts, one acquired a departing insurer’s business, and one recently closed down its voluntary agencies in Massachusetts.” Id. at 2. The Tillinghast Report in April 2004 confirmed that low loss ratio and high loss ratio ERPs were not distributed proportionately among servicing carriers and, as a consequence, “(t)hose carriers with a higher proportion of‘high loss ratio’ ERPs have little chance of making a profit in the state, while carriers with less than their proportionate share of these agencies have had significantly better than average results.” Tillinghast Report at 9. On April 29, 2004, the Commissioner sent a letter to CAR declaring that, based on her review of the Tillinghast Report, she had concluded that the existing plan did not provide for the equitable distribution of premiums and losses and directed CAR to submit a new plan for the residual market. After various proposals and numerous public hearings, the Commissioner ultimately approved on December 31, 2004 the Revised CAR Rules that are challenged in this litigation.
The Revised CAR Rules establish the Massachusetts Automobile Insurance Plan (“MAIP”), which the Commissioner readily admits is an Assigned Risk Plan. Under the MAIP:
Every insurance company may decline to accept any applicant for automobile insurance coverage and must inform the applicant in writing as to the reasons for the declination. MAIP Rule 26(A)(1);
A rejected applicant may apply to MAIP to be randomly assigned to a servicing carrier (known as an “Assigned Risk Company”) by certifying in a sworn statement that he has attempted and been unsuccessful in obtaining insurance in the voluntary market. MAIP Rules 26(A)(1) & 28(B);
The MAIP will then assign the rejected applicant to a servicing carrier. The applicant can ask to be assigned to a particular carrier but has no right to an assignment of his choice. MAIP Rule 26(A)(1).
At least one category of rejected applicants, however, is not eligible to be assigned by MAIP to a servicing carrier — a driver who has not had a traffic violation and has not been found to be at fault for an accident in the last three years. If any of these safe drivers (referred to in the industry as “clean in three”) are rejected by the voluntary market and cannot find an insurer willing to accept them, perhaps because they live in a high-crime area, they will be unable to obtain insurance in the involuntary market. Of course, if they were then to drive carelessly so as to receive a traffic violation or be at fault in an automobile accident, they would again become eligible for assignment by MAIP to a servicing carrier. MAIP Rule 26(A)(3).
Any person who obtains insurance through a group marketing plan under G.L.c. 175, §193R is not eligible for placement by MAIP with a servicing carrier. MAIP Rule 26(A).
The Assigned Risk Company will collect the premiums from the drivers assigned to it in the involuntary market and will bear the losses associated with those risks. MAIP Rule 30.
DISCUSSION
The crux of the plaintiffs’ argument is that the Commissioner acted outside her statutory authority by issuing the Revised CAR Rules that established the MAIP because the Assigned Risk Plan it creates is prohibited by G.L.c. 175, §113H.
Substantial, but not unlimited, deference must be given to the Commissioner’s efforts to interpret a *447 statute she is obliged to implement. Massachusetts Hosp. Ass’n v. Department of Med. Sec., 412 Mass. 340, 345-46 (1992). As the Supreme Judicial Court has declared:
“A state administrative- agency in Massachusetts has considerable leeway in interpreting a statute it is charged with enforcing.” A. Celia, Administrative Law and Practice §747 (1986). Regulations properly adopted by an administrative agency stand on the same footing as statutes and all rational presumptions are to be made in favor of their validity. Such regulations are not to be declared void unless these provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate. These principles of deference, however, are not principles of abdication. When an agency’s interpretation of its regulation cannot be reconciled with the governing legislation, that interpretation must be rejected.
Nuclear Metals, Inc. v. Low-Level Radioactive Waste Management Board, 421 Mass. 196, 211 (1995) (citations omitted). See also Dowell v. Commissioner of Transitional Assistance, 424 Mass. 610, 612-13 (1997); Correia v. Department of Public Welfare, 414 Mass. 157, 165 (1993). Here, if the Commissioner’s interpretation of G.L.c. 175, §113H “is contrary to the plain language of the statute and its underlying purpose,” it must be rejected. See Massachusetts Hosp. Ass’n v. Department of Med. Sec., 412 Mass, at 346.
To determine whether the Revised CAR Rules can be reconciled with G.L.c. 175, §113H, this Court must look not only to the language of the Act but also to its purpose and history. Id.; Sterilite Corp. v. Continental Casualty Co., 397 Mass. 837, 839 (1986). The Commissioner concedes that the Assigned Risk Plan created by the Revised CAR Rules would have been prohibited under the 1973 legislation, but she contends that the 1983 revision to G.L.c. 175, §113H permits her proposed plan. She is wrong. As is plain from the history of this statute set forth earlier, there is nothing in the 1983 legislation that suggests any legislative intent to permit the Commissioner to re-establish an Assigned Risk Plan that the Legislature had specifically dis-established ten years earlier.
There are at least three independent ways to demonstrate that an Assigned Risk Plan is fundamentally contrary to the letter, underlying purpose, and spirit of the current version of G.L.c. 175, §113H, as amended in the 1983 legislation. First, the term of art that the Legislature used in 1973 to signify its rejection of the Assigned Risk Plan in favor of the Reinsurance Plan was to drop its earlier requirement of a “plan for the fair and equitable apportionment among insurance companies of applicants for insurance who are . . . unable to procure through ordinary methods motor vehicle liability insurance” and replace it with “a plan for the fair and equitable apportionment among such insurance companies of premiums, losses or expenses, or any combination thereof incurred under policies issued to applicants which are reinsured through suchplan. . .” Compare G.L.c. 175, §113H(A) (1953) with G.L.c. 175, §113H (1973)(A) (emphasis added). The 1983 legislation did not speak of the fair and equitable apportionment of “applicants”; rather, it required that the “plan shall provide for the fair and equitable apportionment among such insurance companies of premiums, losses or expenses, or any combination thereof,” which signified that the Legislature intended to preserve a hybrid Reinsurance Plan and not return to an Assigned Risk Plan. G.L.c. 175, §113H (1973) (emphasis added).
The Commissioner contends that the omission from the 1983 statute of the phrase in the 1973 legislation italicized above — "incurred under policies issued to applicants which are reinsured through such plan"— can be interpreted to mean that the Legislature no longer required a Reinsurance Plan and thereby reflected its tolerance of an Assigned Risk Plan. However, the omission of this phrase did not begin with the 1983 legislation, which created the hybrid CAR, but with the 1977 legislation, which left the Reinsurance Plan Facility in place and simply modified the permissible rate structure. Since the Legislature plainly did not intend in 1977 fundamentally to alter the structure of the relatively new Reinsurance Plan and cannot be understood to have silently authorized the restoration of an Assigned Risk Plan it had expressly revoked four years earlier, the Commissioner’s interpretation of the omission of this phrase is untenable.
If, as the Commissioner now contends, the Legislature in 1983 intended to permit an Assigned Risk Plan that it had ten years earlier eliminated, one would think that this turnaround would have been recognized by someone in the insurance industry at or around its enactment. Yet, the Commissioner has offered no evidence that anyone at the time understood this to be a consequence of the 1983 legislation. Certainly, Commissioner Gailey, writing in 1989, understood that the 1983 legislation, which he was obligated to implement, simply “replaced the Facility with ... a hybrid of a joint underwriting association and a reinsurance facility.” Gailey Report at 23.
Second, inherent in a Reinsurance Plan but inconsistent with an Assigned Risk Plan is the requirement that insurance companies “take all comers.” As discussed earlier, the 1973 legislation expressly included a “take all comers” provision in G.L.c. 175, §113E (1973). This provision needed to be modified in 1983 because, under the hybrid plan, not all of the insurance carriers in Massachusetts were to be servicing carriers in the involuntary market; only at least twenty of them were to play this role. If a high-risk driver were to apply to a non-servicing carrier, that carrier could reject his application. A servicing carrier, however, under the 1983 legislation could not reject any application brought to it by the ERP assigned to it, unless *448 the driver had not paid his premiums or had lost his license. G.L.c. 175, §113H(A) & (C) (1983). When the 1983 legislation was enacted, the Division of Insurance’s General Counsel understood that the “take all comers” rule continued to apply to all servicing carriers. In describing the new legislation, she wrote, “Insurance companies which are appointed to act as Servicing Carriers for the new residual market plan must accept any qualified applicant as was required of all companies in the past.” CAR Proposed Changes to the Rules of Operation (November 23, 2004) at 28-29, quoting Joan Gerritty, Massachusetts Division of Insurance, “Chapter 241 of the Acts of 1983, An Overview.” Commissioner Gailey in 1989 also shared this understanding, writing, “Under CAR, only servicing carriers are required to accept all applicants and can choose whether they want to voluntarily retain or cede a risk.” Gailey Report at 23. Since G.L.c. 175, §113H requires all servicing carriers to accept all applicants, the statute effectively bars an Assigned Risk Plan, because the ability of servicing carriers to reject applicants is part and parcel of an Assigned Risk Plan.
Third, inherent in an Assigned Risk Plan is not only the power of servicing carriers to reject applicants but also the obligation to inform applicants that they have been rejected so that they may apply for random assignment to an insurer in the involuntary market under the Assigned Risk Plan. Indeed, as noted earlier, the Revised CAR Rules require an insurance carrier who declines to accept an applicant to notify that applicant in writing of the declination. MAIP Rule 26(A). G.L.c. 175, §113H(C), however, expressly declares that a servicing carrier “may not endorse or declare that the policy is underwritten by the plan.” G.L.c. 175, §113H(C). In short, under §113H(C), the insurance company may not tell any driver that he is in the involuntary market and the driver would generally not know that he has been placed in the involuntary pool. Under MAIP, the insurance company must tell every rejected applicant that his application has been declined and the driver must apply for coverage in the involuntary market.[1]
Since the Revised CAR Rules creating an Assigned Risk Plan are contrary to the plain language of G.L.c. 175, §113H and its underlying spirit and purpose, the Commissioner did not have the statutory authority to issue them and they must be vacated.
To be clear, by annulling the Commissioner’s December 31, 2004 Order and vacating the Revised CAR Rules, this Court is not passing judgment on the wisdom of those Rules or making any policy statement that the present hybrid CAR Plan is preferable to an Assigned Risk Plan, such as MAIP. Such policy decisions are not the proper province of this Court. Nor is there anything in this Order that prevents the Commissioner from revising the CAR Rules so as to address the unfairness that has arisen from the inequitable distribution of high risk and low risk ERPs among insurance companies. Rather, this Court is simply declaring that the Commissioner cannot create an Assigned Risk Plan like MAIP without the blessing of the Legislature, reflected by fundamental amendments to G.L.c. 175, §113H.
ORDER
For the reasons stated above, after hearing, it is hereby ORDERED that:
1. The plaintiffs’ motion for judgment on the pleadings is ALLOWED. The Commissioner’s December 31, 2004 Order is hereby ANNULLED and the Revised CAR Rules issued pursuant to that Order are hereby VACATED.
2. Judgment shall issue forthwith in favor of the plaintiffs.

There are at least two additional ways in which the Revised CAR Rules are in conflict with the language and purpose of G.L.c. 175, §113H, but these two are less fundamental than the first three and could be remedied by modest changes in the MAIP, so they are relegated to footnote.
First, §113H provides that the plan to be approved by the Commissioner “shall provide motor vehicle insurance to applicants who have been unable to obtain insurance through the method by which insurance is voluntarily made available,” unless the applicant has failed to pay his premiums or has lost his driver’s license. G.L.c. 175, §113H(A). The Revised CAR Rules, however, through a provision that would make FTanz Kafka smile, do not guarantee that the safest drivers— those who have been “clean” of any traffic violations and any at fault accidents for three years — will be able to obtain motor vehicle insurance, because carriers may still reject them and they may not be placed in the MAIP. MAIP Rule 26(2) (b). Until the CAR Rules are amended to require servicing carriers to accept these “clean in three” drivers or to permit these safe drivers to be placed in the involuntary market if the carriers, for any reason, decline to insure them, these CAR Rules will run afoul of the statutory mandate to provide automobile insurance to all qualified drivers set forth in G.L.c. 175, §113H.
Second, G.L.c. 175, §193R provides:
The commissioner shall make and at any time may alter or amend reasonable rules and regulations regarding insurance issued pursuant to a group marketing plan; provided, however, that insurance issued pursuant to a group marketing plan shall be cedeable and the experience of each group plan, both voluntary and ceded, shall be used in determining a company’s losses and expenses in accordance with the attribution rules established under the provisions of (§113HJ.
The Revised CAR Rules, however, declare that an applicant “shall not be placed in the MAIP . . . [i]f a person obtains insurance through a group marketing plan pursuant to G.L.c. 175, §193R.” MAIP Rule 26(A)(3). By expressly requiring that automobile insurance policies issued through a group marketing plan are “cedeable” and by making express reference to §113H, the Legislature in G.L.c. 175, §193R declared that the risks posed by those insured through a group marketing plan may be placed in the involuntaiy market and ceded to the reinsurance pool. The Revised CAR Rules, by prohibiting those insured through a group marketing plan from entering the involuntary market, violates the letter, purpose, and spirit of that statutory provision.